302 Ga. 587
FINAL COPY

S17A1059.  THE STATE v. CASH et al.

HINES, Chief Justice.

This is an appeal by the State from an order of the superior court sustaining a motion by mother and daughter murder defendants Elgerie Mary Cash and Jennifer Michelle Weathington denominated "Double Jeopardy Plea in Bar," which challenged the sufficiency of the evidence of their guilt at trial.[1] For the reasons that follow, we reverse and remand with direction.

*Procedural History*

Cash and her daughter Weathington were tried jointly before a jury in the Superior Court of Paulding County in October 2013 and found guilty of malice murder, felony murder, two counts of aggravated assault, and possession of a firearm during the commission of a felony in connection with the fatal shooting

---

[1] In this same document, the superior court also reconsidered a previous order on defendants' motion to dismiss for failure to provide a speedy trial, set aside such order, and issued an amended order denying the motion to dismiss based upon the alleged violation of the right to a speedy trial. However, this appeal addresses only the sustaining of the "Double Jeopardy Plea in Bar."

of Lennis Jones. Each woman was sentenced to life in prison for malice murder and a consecutive term of five years in prison for the firearm possession. Claiming that Jones accidentally shot himself, Cash and Weathington each filed a motion for new trial, which motions were subsequently amended. Following a joint hearing on the motions, as amended, in May 2014 the superior court entered separate orders  granting each defendant a new trial, and then approximately a week later  issued a joint amended order granting new trials to the defendants and vacating their convictions and sentences. The superior court did so after finding that the defendants received ineffective assistance of counsel at trial and based upon the general grounds, i.e., that the verdicts were contrary to the principles of justice and equity and decidedly and strongly against the weight of the evidence. See OCGA §§ 5-5-20,[2] 5-5-21.[3] The State appealed the grants of new trials to the defendants, and this Court affirmed, determining that

---

[2] OCGA § 5-5-20 provides:
> In any case when the verdict of a jury is found contrary to evidence and the principles of justice and equity, the judge presiding may grant a new trial before another jury.

[3] OCGA § 5-5-21 provides:
> The presiding judge may exercise a sound discretion in granting or refusing new trials in cases where the verdict may be decidedly and strongly against the weight of the evidence even though there may appear to be some slight evidence in favor of the finding.

the superior court "who observed the trial and who had the duty to examine the conflicts in the evidence and the credibility of the witnesses in ruling on the general grounds, did not abuse its broad discretion in granting [defendants] new trials on the general grounds." *State v. Cash*, 298 Ga. 90, 97 (2) (c) (779 SE2d 603) (2015) ("*Cash I*").[4]  Upon return of the remittiturs, Weathington filed her "Double Jeopardy Plea in Bar," claiming that the evidence at trial was insufficient under the standard of *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979), and consequently, that the State could not again put her in jeopardy for the same offenses; Cash adopted her daughter's motion as her own.  The superior court sustained the motion, finding that the defendants had not waived their rights to challenge the sufficiency of the evidence of their guilt of the crimes charged under *Jackson v. Virginia*, and that the evidence was insufficient under such standard; it expressly directed that a judgment of acquittal be entered as to both defendants on all counts of the charging

---

[4] Prior to the scheduled hearing on the new trial motions, the State filed a motion to recuse the trial judge, and the trial judge dismissed the recusal motion as legally insufficient without referring it to another judge, and orally denied the State's request for a certificate of immediate review.  In *Cash I*, the State also attempted to appeal the denial of its motion to recuse, but this Court determined that it did not have jurisdiction to review that ruling and dismissed that portion of the State's appeal.  Id. at 93-94 (1).

indictment.[5]

## Jurisdiction of the Appeal

As this Court reaffirmed in *Cash I*, "[a]ppeals by the State in criminal cases are construed strictly against the State and 'the State may not appeal any issue in a criminal case, whether by direct or discretionary appeal, unless that issue is listed in OCGA § 5-7-1.'"[6] Id. at 91 (1) (a) (citation omitted).

---

[5] Defendants had filed cross-appeals to the State's original appeal in *Cash I*, challenging the denial of their motions for new trial on the basis of insufficiency of the evidence; however, they were permitted to withdraw the cross-appeals because the superior court had not entered a written order on that ground but had merely remarked in its oral ruling from the bench at the motion-for-new-trial hearing that the evidence was legally sufficient under *Jackson v. Virginia* to support the defendants' convictions.

[6] Former OCGA § 5-7-1 in effect at the times of filing the judgment at issue and the notice of appeal in 2016 provided:

(a) An appeal may be taken by and on behalf of the State of Georgia from the superior courts, state courts, and juvenile courts and such other courts from which a direct appeal is authorized to the Court of Appeals and the Supreme Court in criminal cases and adjudication of delinquency cases in the following instances:

(1) From an order, decision, or judgment setting aside or dismissing any indictment, accusation, or a petition alleging that a child has committed a delinquent act, or any count thereof;

(2) From an order, decision, or judgment arresting judgment of conviction or adjudication of delinquency upon legal grounds;

(3) From an order, decision, or judgment sustaining a plea or motion in bar, when the defendant has not been put in jeopardy;

(4) From an order, decision, or judgment suppressing or excluding evidence illegally seized or excluding the results of any test for alcohol or drugs in the case of motions made and ruled upon prior to the impaneling of a jury or the defendant being put in jeopardy, whichever occurs first;

(5) From an order, decision, or judgment excluding any other evidence to be used by the state at trial on any motion filed by the state or defendant at least 30 days prior to trial and ruled on prior to the impaneling of a jury or the defendant being put in jeopardy, whichever occurs first, if:

Applicable OCGA § 5-7-1 (a) (3)[7] provides that the State may appeal to this Court from "an order, decision, or judgment sustaining a plea or motion in bar, *when the defendant has not been put in jeopardy*." (Emphasis supplied.) Weathington has moved to dismiss the State's appeal, arguing that in *Cash I* this Court already ruled that jeopardy attached at her first trial. But, the argument

(A) Notwithstanding the provisions of Code Section 5-6-38, the notice of appeal filed pursuant to this paragraph is filed within two days of such order, decision, or judgment; and

(B) The prosecuting attorney certifies to the trial court that such appeal is not taken for purpose of delay and that the evidence is a substantial proof of a material fact in the proceeding;

(6) From an order, decision, or judgment of a court where the court does not have jurisdiction or the order is otherwise void under the Constitution or laws of this state;

(7) From an order, decision, or judgment of a superior court transferring a case to the juvenile court pursuant to Code Section 15-11-560 or subsection (b) of Code Section 17-7-50.1;

(8) From an order, decision, or judgment of a court granting a motion for new trial or an extraordinary motion for new trial;

(9) From an order, decision, or judgment denying a motion by the state to recuse or disqualify a judge made and ruled upon prior to the defendant being put in jeopardy; or

(10) From an order, decision, or judgment issued pursuant to subsection (c) of Code Section 17-10-6.2.

(b) In any instance in which any appeal is taken by and on behalf of the State of Georgia in a criminal case, the defendant shall have the right to cross appeal. Such cross appeal shall be subject to the same rules of practice and procedure as provided for in civil cases under Code Section 5-6-38.

(c) In any instance in which the defendant in a criminal case applies for and is granted an interlocutory appeal as provided in Code Section 5-6-34 or an appeal is taken pursuant to Code Section 17-10-35.1, the state shall have the right to cross appeal on any matter ruled on prior to the impaneling of a jury or the defendant being put in jeopardy. Such cross appeal shall be subject to the same rules of practice and procedure as provided for in civil cases under Code Section 5-6-38. The state shall not be required to obtain a certificate of immediate review for such cross appeal.

[7] The language of current OCGA § 5-7-1 (a) (3), effective January 1, 2017 is the same.

is unavailing.

It is true that in *Cash I* this Court held that the State was not allowed to appeal the denial of its motion to recuse the trial judge under OCGA § 5-7-1 (a) (9), which authorizes the State to appeal an order denying a motion by the State to recuse a judge only when the motion is made and ruled upon prior to the defendant being put in jeopardy; because the State did not file its motion to recuse until after the defendants were convicted and shortly before the hearing on their motions for new trial, jeopardy had attached. *Cash I* at 91- 92 (1) (a). Compare *State v. Caffee*, 291 Ga. 31, 33-35 (3) (728 SE2d 171) (2012) (holding that OCGA § 5-7-1 (a) (3) gives this Court authority to consider State's appeal of order sustaining plea in bar entered after trial court granted motion for new trial due to improper admission of evidence). But, this does not answer the question of whether the defendants have been put in jeopardy in their retrial for the purpose of OCGA § 5-7-1 (a) (3).

Before 1973 there was no statutory provision in Georgia for the State to appeal rulings in criminal cases; however, in 1973 the General Assembly enacted a law,[8] then codified in part as Code Ann. § 6-1001a (now OCGA §

---

[8] Ga. L. 1973, p. 297, § 1.

5-7-1), substantially similar to the pre-1971 version of 18 USC § 3731, a part of the federal Criminal Appeals Act. See *State v. Morrell*, 281 Ga. 152, 153, n.6 (635 SE2d 716) (2006). The new statute provided the State with limited avenues of appeal in criminal cases. *State v. Martin*, 278 Ga. 418, 419 (603 SE2d 249) (2004). The United States Supreme Court interpreted the pre-1971 version of 18 USC § 3731 in *United States v. Jorn*, 400 U. S. 470 (91 SCt 547, 27 LE2d 543) (1971). In *Jorn*, the government sought to appeal an order of the District Court which dismissed, on the ground of former jeopardy, an information charging the defendant-appellee Jorn with crimes involving fraudulent income tax returns. After the impaneling of the jury for the initial trial, the prosecutor called to the stand a taxpayer whom Jorn allegedly had aided in tax preparation; however, the trial judge refused to permit the witness and other similar witnesses to testify because the judge did not believe the witnesses had been adequately advised of their rights. Consequently, the judge discharged the jury and ended the trial. The case was then set for retrial before another jury, but Jorn filed a pretrial motion to dismiss the charges against him, and the trial judge did so on the basis of former jeopardy. The government filed a direct appeal from the dismissal, and the threshold question was whether the

7

government had such a right of appeal from the adverse ruling.  The issue was governed by the "motion-in-bar" provisions of applicable 18 USC § 3731, which provided, in language similar to that of OCGA § 5-7-1 (a) (3), that the government had a direct right of appeal from  "the decision or judgment sustaining a motion in bar, when the defendant has not been put in jeopardy."[9] The question then became whether Jorn had been put in jeopardy for the purpose of the government's right to appeal by virtue of the impaneling of the jury in the first proceeding before the declaration of a mistrial.  *United States v. Jorn*, 400 U. S. at 475.  The Supreme Court concluded that "the sustaining of a motion in bar based on a plea of former jeopardy would be appealable as long as the motion in bar was sustained prior to the impaneling of the jury in the subsequent proceeding."  Id. at 477.

There is no dispute that the "Double Jeopardy Plea in Bar" in the present case was sustained prior to any impaneling of a jury for a retrial; thus, OCGA § 5-7-1 (a) (3) allows the State's appeal.

*Sufficiency of the Evidence*

---

[9] It was conceded that the plea of former jeopardy constituted a "motion in bar" within the meaning of the statute.  *United States v. Jorn*, 400 U. S. at 475.

8

As a threshold matter, the State contends that the superior court erred in sustaining defendants' "Double Jeopardy Plea in Bar" and then dismissing the charges against them on the ground of insufficiency of the evidence because defendants had abandoned the sufficiency issue in *Cash I* and because the superior court was without jurisdiction to entertain the motion in the first place. Indeed, defendants filed cross-appeals to the State's original appeal in *Cash I*, challenging the denial of their motions for new trial on the basis of insufficiency of the evidence; however, they were permitted to withdraw the cross-appeals after they moved to do so on the basis that the superior court had not entered a written order on the sufficiency ground but had merely stated in its oral ruling from the bench at the motion-for-new-trial hearing that the evidence was legally sufficient to support the defendants' convictions under *Jackson v. Virginia*.[10] In general, an oral ruling is neither final nor appealable until and unless it is reduced to writing. *Hill v. State*, 281 Ga. 795, 799 (3) (642 SE2d 64) (2007). Thus, the oral ruling on the sufficiency of the evidence was not the appropriate focus of a cross-appeal, and defendants did not abandon the issue by virtue of

---

[10] It is undisputed that the superior court stated from the bench that the evidence at trial satisfied the *Jackson v. Virginia* standard. The motion at issue in the present appeal was heard before, and ruled upon by, a different judge than the one that issued the rulings in *Cash I*.

9

their withdrawals of their cross-appeals in *Cash I*. Nor was there any ruling in *Cash I* which precluded the filing and consideration of defendants' "Double Jeopardy Plea in Bar." Consequently, this Court will review the legal sufficiency of the evidence at defendants' trial. See *State v. Caffee*, supra at 34-35 (3).

The standard of *Jackson v. Virginia* for assessing the legal sufficiency of the evidence is different than the discretion given a trial court in an evidentiary challenge based upon the general grounds. *Manuel v. State*, 289 Ga. 383, 386-387 (2) (711 SE2d 676) (2011). Indeed,

> [e]vidence may be less than overwhelming, but still sufficient to sustain a conviction. When we consider the legal sufficiency of the evidence, we must put aside any questions about conflicting evidence, the credibility of witnesses, or the weight of the evidence, leaving the resolution of such things to the discretion of the trier of fact. Instead, we must view the evidence in the light most favorable to the verdict, and we inquire only whether any rational trier of fact might find beyond a reasonable doubt from that evidence that the defendant is guilty of the crimes of which he was convicted.

*Walker v. State*, 296 Ga. 161, 163 (1) (766 SE2d 28) (2014) (citations and puncutation omitted).

The evidence construed in favor of the verdicts showed the following. At about 2:30 p.m. on May 30, 2011, Cash telephoned 911 to report a shooting at her home. A police officer was in the area and arrived at the scene within one to two minutes of the 911 call. Cash was standing on her front porch, crying and screaming for help; she said, "My daughter's boyfriend just shot himself." Cash directed the police officer to an upstairs bedroom, where he found Weathington cradling Jones's head, which had a towel wrapped around it. Jones was lying on the floor with his "legs somewhat propped" as if he had "pulled [his] feet up to [him]" with his "knees in the air, slightly to his left side with his left hand and arm laying" alongside. There was a large amount of blood on the floor. Weathington was hysterical, crying for help, and telling Jones to "hang on." Jones had a single gunshot wound to the head but was still breathing. A handgun was lying near Jones's feet and underneath a bench in the room. There was a can of beer and a bottle of liquor on the dresser; both appeared to be cold and full of liquid. Cash was standing next to the bed near the bedpost and between it and the wall. She appeared to be upset and "almost angry."

Jones was taken to the hospital and died later that day. Before Jones was removed from the home, the officer asked Cash what happened, and she

responded that "she was standing in-between the bed and the wall where the bullet hole was," and that she "wanted to show [Jones] the gun." Cash stated, "I came back here. I grabbed it. I charged it. Nothing came out. He grabbed it, and he said it's not loaded. I told him it was loaded. And he stuck the gun to his head and pulled the trigger, and he shot himself." She then said only one shot had been fired. She also indicated that only she, Weathington, and Jones were in the room at the time of the shooting. Weathington did not describe what happened in any detail or differently from what Cash related, but simply agreed completely with her mother's version of events.

The police officer thought the crime scene "unusual" in relation to the defendants' story in that he saw a bullet hole through the wall but no physical evidence of injury around the bullet hole; in his experience when someone shot himself in the head there were usually large amounts of blood, brain matter, bones, fragments, or skin on or about the bullet hole, but such markers were not present there. Instead, blood was coming out of Jones's nose and a significant amount of blood and brain matter was on the floor underneath his head. Also unusual was the fact that when the officer entered the bedroom and knelt down and observed Weathington she was covered with a consistent and large amount

of high velocity blood spatter. Cash had a large amount of blood on her hands. After Jones was transported from the scene, the police officer noticed that both Cash and Weathington had "cleaned themselves up," washing off all traces of Jones's blood. Weathington was seated on a couch in the living room and made a phone call to someone, telling that person that Jones had shot himself; the conversation turned into an argument with Weathington yelling at the person.

Other police officers arrived at the scene, and Cash then spoke with one of those detectives; she related a somewhat different version of events, including notably that she accidentally fired a shot into the wall before Jones asked for the weapon. Cash told another officer that she was Weathington's mother; that Jones was Weathington's boyfriend; that Jones had just finished mowing Cash's lawn; that he came inside the house and consumed approximately three alcoholic beverages; and that Jones then asked to see her new gun. She stated that she then took the handgun out of the nightstand next to the bed; that she dropped the magazine onto the bed and pulled back the slide; that a bullet did not eject; that she pointed the handgun toward the wall, pulled the trigger, and the firearm discharged; and that she threw the handgun on the bed. She claimed that Jones then picked up the handgun and said, "there's nothing wrong with this gun";

13

that he slammed the magazine into the handgun and racked the slide back three times, discharging three rounds onto her bed; that she took the handgun from Jones and could see a glint of the metal bullet and told him it was still loaded; that Jones responded, "no it's not"; and that he took the handgun from her, put it to his head and pulled the trigger.

A Georgia Bureau of Investigation ("GBI") firearms examiner, expert in firearms identification and function, testified that when the handgun at issue, a Glock .40 caliber pistol, is loaded and the slide is closed you cannot see the bullet, not even a glimmer of metal of the shell; however, that one could see the bullet if the slide is open, but that the handgun will not fire in that state.

Later in the day on May 30, Cash went to the sheriff's office for an interview. There she demonstrated how Jones allegedly shot himself. She pointed at her temple; however, the investigation had already revealed that the entry gunshot wound was behind and below Jones's right ear. The bullet entered the back of Jones's head and it traveled forward and exited the head near the hairline on the left side. The police viewed this inconsistency as suspicious. Consequently, they asked that an autopsy be performed to determine "muzzle to impact or the target range" and direction of the bullet once it entered Jones's

14

head.

Although there was a hat on the dresser in the bedroom where the shooting occurred, the police did not take it on the day of the crime despite a thorough investigation of the crime scene. It was recovered a week later after police noticed it in a photograph of the crime scene they were reviewing. Before it was recovered, Cash had at one time placed it in the garbage but then retrieved it; at another time, she had put it in her laundry room with some dirty clothes. The hat bore a "minute amount" of blood and had a bullet hole that matched the location of the entry wound to the victim's head, but it had no exit hole.

The medical examiner who conducted the autopsy of Jones determined that Jones was shot from an indeterminate range but more than eighteen inches away, and that it was not a close or contact-range gunshot wound, inasmuch as there was a lack of stippling or fouling at the wound site and no gunshot residue inside the skull or on the skin. The medical examiner concluded that the cause of death was an indeterminate range gunshot wound to the head with perforations of the skull and brain and that the manner of death was not self-inflicted but was a homicide. The autopsy was conducted before the hat was discovered by the police; however, at trial the medical examiner testified that if

Jones had been wearing the hat at the time of the fatal shooting, there would have been biologic material on the inner brim of the hat underlying the entrance gunshot wound and on the under surface of the front brim near the exit wound, but there was nothing of such significance found. He concluded that there was no possibility that the hat was on Jones's head when he sustained the fatal head wound.[11]

Jones's son testified at trial that his father "took gun safety to an extreme," telling the son to "always keep the gun in front of you, pointing away." He further testified that Jones was left-handed and "could do almost nothing with his right hand."

Cash and Jones had been childhood friends from the age of fifteen and Jones had lived with Cash, but for a period of time prior to the shooting there had been a rift between the two as a result of Jones dating Weathington and the age difference between him and Cash's daughter. A friend of Jones testified that at one point he helped Jones move his "stuff" out of Cash's house, and that at that time there was a big confrontation between Cash and Jones; Cash threatened

---

[11] The State's theory presented to the jury was that Weathington held the hat while Cash fired a round through it, which accounted for the bullet hole in the wall.

Jones and said "how much she hated him."

Weathington told the police that Cash called her the night before the shooting and informed her that she had just bought a new gun. But, the purchase of the handgun at issue took place at least a month or two prior to Jones's death, and Weathington had accompanied Cash when she went to make the purchase.

A vice president of the company that employed Jones testified that a couple of days after the shooting, he received a phone call from a young woman who said that she was Jones's girlfriend. The woman inquired about Jones's life insurance, stating that Jones had told her that she was the beneficiary.

Here, there was ample evidence, forensic and otherwise, to support the determination that the shooting was a homicide. And, contrary to findings by the superior court in making the ruling at issue, there was evidence from which the factfinder could conclude that Cash rather than Weathington likely fired the fatal shot, and that the mother and daughter cooperated, even conspired, with each other to accomplish the killing and then portray the shooting as self-inflicted, and that each intentionally aided and abetted the other in the

17

commission of the crimes.[12]  Indeed, when "the crimes 'involve relatives, slight circumstances can support the inference that the parties colluded.'" *Teasley v. State*, 288 Ga. 468, 469 (704 SE2d 800) (2010), quoting *Adamson v. State*, 238 Ga. App. 105, 106 (2) (516 SE2d 310) (1999).   Moreover, if a defendant has knowledge of the crime which is intended and shares in the criminal intent of the principal actor, that defendant is an aider and abettor.  *Ratana v. State*, 297 Ga. App. 747, 749 (678 SE2d 193) (2009).   Consequently, if such defendant is at the scene and does not oppose the commission of the crime, the trier of fact may consider such conduct in connection with prior knowledge and is authorized to conclude that the defendant assented and lent approval to the commission of the crime, and thus, was aiding and abetting it.   Id.   Here, the evidence that Weathington accompanied her mother to purchase the murder weapon well prior to the shooting, that Weathington actively lied to police about the timing of its acquisition, and that she not only affirmed her mother's varying versions of events, but immediately following the shooting began to promote to third parties their joint stories that Jones shot himself support the finding that she aided and

---

[12] The jury was charged on the law of conspiracy and accomplice culpability.

abetted the killing.  Compare *Bullard v. State*, 263 Ga. 682, 685 (1) (436 SE2d 647) (1993) (neither direct nor sufficient circumstantial evidence that non-shooter  was a party to the murder, but cooperated and concealed the death out of fear of the shooter); *Moore v. State*, 255 Ga. 519, 521 (340 SE2d 888) (1986) (some circumstantial evidence of motive, presence, and flight but no direct evidence that defendant was even present at time of murder); *Brown v. State*, 250 Ga. 862 (302 SE2d 347) (1983) (no direct evidence of one defendant's participation in murder and no circumstantial evidence aside from presence at the scene).  Even if the evidence did not conclusively establish which of the women actually shot Jones, there was evidence of a common criminal intent, including the women's presence, companionship, and conduct before and immediately after the fatal shooting.  *Shockley v. State*, 297 Ga. 661, 664-665 (1) (777 SE2d 245) (2015). Consequently, the evidence was sufficient to enable a rational trier of fact to find both Cash and Weathington guilty beyond a reasonable doubt of the crimes of which they were convicted.  *Jackson v. Virginia,* supra.

Accordingly, the judgment sustaining the "Double Jeopardy Plea in Bar"

on the basis of insufficient evidence in the first trial is reversed and the case is remanded to the superior court for proceedings consistent with this opinion.

Judgment reversed and case remanded with direction. All the Justices concur.

Decided October 30. 2017.

Murder. Paulding Superior Court. Before Judge Bucci.

Donald R. Donovan, District Attorney, Steven J. Messinger, Anthony B. Williams, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew B. Crowder, Assistant Attorney General, for appellant.

Ross & Pines, Andrew S. Fleischman; Henrickson & Sereebutra, Aaron S. Henrickson, for appellees.