304 Ga. 213
FINAL COPY

S18A0846.  MANGRAM v. THE STATE.

GRANT, Justice.

DayQuan Mangram was convicted of malice murder and related crimes in connection with the shooting death of Untavious Gillard.[1]  In this appeal, Mangram challenges the sufficiency of the evidence corroborating the testimony of a co-indictee and contends that the trial court erred in denying his motion for mistrial after the State introduced testimony about a rumor that

---

[1]  Gillard was killed on May 25, 2012.  On September 7, 2012, Mangram, Shaquilla White, and Rena Lang were indicted by a Brantley County grand jury for malice murder, felony murder, aggravated assault, possession of a firearm during the commission of a crime, and concealing a death.  Mangram was also indicted for possession of a handgun by a person under the age of 18 years.  White pled guilty before trial to concealing a death and was sentenced to ten years, with five to serve in prison and the remainder on probation.  Mangram and Lang were tried jointly April 30 – May 3, 2013.  The jury found Mangram guilty on all counts in the indictment.  The trial court sentenced him to life in prison for malice murder, years consecutive for concealing a death, five years consecutive for possession of a firearm during the commission of a crime, and 12 months for possession of a handgun by a person under 18.  The trial court purported to merge the aggravated assault into the felony murder count and the felony murder count into the malice murder count; in reality, the felony murder count was vacated by operation of law and the aggravated assault count merged with the malice murder count.  See *Culpepper v. State*, 289 Ga. 736, 738 (715 SE2d 155) (2011).  On May 9, 2013, Mangram filed a motion for new trial, which was subsequently amended on February 26, 2016, and supplemented on May 19, 2016.  The trial court denied the motion for new trial on February 6, 2017.  Mangram filed a timely notice of appeal on February 23, 2017, and the case was docketed in this Court for the April 2018 term and submitted for decision on the briefs.

the victim had a bounty on his head.  We affirm.

I.

Viewed in the light most favorable to the jury's verdicts, the evidence presented at trial showed the following.  On May 25, 2012, Rena Lang and Shaquilla White picked up Mangram and Gillard in Lang's silver Chevrolet Impala.  Lang directed White to drive to the home of an acquaintance in Brantley County so that Lang could collect money that the acquaintance owed her.  When they arrived at the acquaintance's mobile home, Lang and White got out of the vehicle, leaving Mangram and Gillard sitting in the back seat.

Lang and White knocked on the front door, did not receive an answer, and went around to try the back door.  When they reached the side of the home, Lang saw her acquaintance's vehicle and stopped to let the air out of the tires.  While she was doing so, White and Lang heard a gunshot from the direction of Lang's car.

The two women ran back around the mobile home and found Mangram standing outside the Impala, saying over and over, "Play with my people . . ." Gillard was slumped over and bleeding in the back seat.  Lang's initial response to Mangram was, "Not in my car, Quan."  After a moment, Lang,

White, and Mangram got into the front seat of Lang's vehicle, and White drove them away. A neighbor, who heard three gunshots and saw two people run from behind the mobile home across the street and get into a silver or gray sedan, called 911 at 3:35 p.m. and reported the incident. She described a thin black male wearing shorts (matching Mangram's description) and a heavy-set black female with red hair wearing a halter top and blue jean shorts (matching Lang's description). The neighbor did not see a third person.

Mangram and Lang directed White to drive down a nearby dirt road, where they pulled over and Mangram dragged Gillard by his feet out of the car and into a grassy area that was difficult to see from the road. Mangram ordered Lang to loot Gillard's pockets. She did so and found a gun, which she gave to Mangram, and money, which she put in her bra. Lang alerted Mangram that his fingerprints were visible on one of Gillard's shoes, prompting him to remove the shoe and take it with him.

The three then got back into Lang's car, with Mangram once again in the back seat, and White drove them back to Brunswick. On the way, White and Lang asked Mangram why he had shot Gillard. All Mangram would say was that Gillard had "played with [his] people," and that the women should "chill the f*** out." Mangram or Lang threw Gillard's cell phone over the

side of a bridge on their way back to Brunswick. Lang told Mangram to throw the murder weapon out too, but he said he needed to return it to its owner.

The three drove to a car wash in Brunswick and attempted to clean Gillard's blood and brain matter out of the back seat. Security cameras at the car wash captured them arriving in Lang's car at 4:06 p.m.[2] and using the car wash's power sprayer and foaming scrub brush to clean the interior of the vehicle, including the floors, seats, windows, doors, and headliner. Mangram was bare-chested because he had used his shirt to scoop Gillard's brain matter out of one of the vehicle's cup holders. Mangram collected some of Gillard's belongings from the vehicle, including the shoe that he had removed from Gillard's body, and put them into a bag with Mangram's shirt and the two guns. After the three finished cleaning Lang's car, White and Lang dropped Mangram off at his grandmother's house. He took the bag of clothing and guns with him.

The next day, White and Lang contacted a mobile car detailer. Lang asked him to clean out the back of her car; she claimed that she had spilled

[2] A special agent of the Georgia Bureau of Investigation testified that she timed the drive from the location where the body was found in Brantley County to the car wash in Brunswick. It took the agent 25 minutes and 35 seconds to make the drive.

4

raw chicken blood and juice in the back seat on the way to a barbecue to account for the reddish stains. The detailer found the interior of the car soaked with water and Fabuloso all-purpose cleanser. He vacuumed out the water and cleanser and shampooed the carpets. Two days later, Lang called him back and told him to bleach the interior, explaining that she was tired of the strong, foul odor and that she had decided to have the interior dyed a different color once the stains were bleached out.

On May 28, 2012, a Florida couple riding a four-wheeler discovered Gillard's body and called 911. Buzzards apparently had eaten some of the flesh from Gillard's face, but investigators eventually identified the body from Gillard's fingerprints. The medical examiner determined that Gillard had been fatally shot two or three times in the left side of the head and once in the back of the neck. Gillard also had at least one gunshot wound going through his left hand and forearm. Two bullets were found inside Gillard's skull, and one was located under Gillard's head at the scene where his body was found.

After the body was discovered and investigators began tracing Gillard's last movements, White went to the Glynn County Police Department and told them what had happened. She claimed that she had been too afraid of

5

Mangram and Lang to contact police earlier; Mangram had threatened her, saying "play with my life and see what happens to yours." Mangram eventually turned himself in to law enforcement as well. He was 17 years old at the time.

## II.

Mangram contends that the trial court erred in denying his motion for a directed verdict of acquittal because there was insufficient evidence to corroborate White's testimony. We disagree.

In order to sustain a conviction, testimony by an accomplice to the crime must be corroborated by other evidence implicating the defendant. OCGA § 24-14-8; *Crawford v. State*, 294 Ga. 898, 900-901 (757 SE2d 102) (2014). Corroborating evidence may be slight, and may be entirely circumstantial. See *Robinson v. State*, 303 Ga. 321, 322-323 (812 SE2d 232) (2018). "The evidence 'need not be sufficient in and of itself to warrant a conviction, so long as it is independent of the accomplice's testimony and directly connects the defendant to the crime or leads to the inference of guilt.'" Id. at 323 (quoting *Parks v. State*, 302 Ga. 345, 348 (806 SE2d 529) (2017)). "[E]vidence of the defendant's conduct before and after the crime was committed may give rise to an inference that he participated in the

crime." *Cisneros v. State*, 299 Ga. 841, 845 (792 SE2d 326) (2016) (citation and punctuation omitted). Once the State has introduced independent evidence implicating the defendant, it is for the jury to decide whether the accomplice's testimony has been sufficiently corroborated. Id.

Here, White's testimony was corroborated by the testimony of the 911 caller who heard gunshots and saw someone matching Mangram's description get into a silver sedan at the location where White said the murder took place. The jury also saw surveillance video showing that Mangram, Lang, and White arrived together at a car wash in Brunswick about 31 minutes after the 911 call, and they heard testimony from a law enforcement officer that her own drive from the site near the murder location where the body was found to the car wash took just over 25 minutes. And the jury watched car wash surveillance video of Mangram removing clothing and other items from the back seat of Lang's car and helping Lang and White thoroughly hose down, scrub, and vacuum the interior of Lang's car, where investigators later found bullet holes and blood containing Gillard's DNA. This evidence was sufficient to corroborate White's testimony under OCGA § 24-14-8.

When reviewing the denial of a motion for directed verdict of acquittal,

we apply the same standard used to evaluate the sufficiency of the evidence supporting a guilty verdict under *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979). *Blackmon v. State*, 300 Ga. 35, 38 (793 SE2d 69) (2016). Under that standard, we view the evidence in a light most favorable to the verdicts and ask whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted. *Jackson*, 443 U. S. at 318-319. Our review leaves to the jury any questions concerning witness credibility, conflicts in the evidence, and the weight of the evidence. See *State v. Cash*, 302 Ga. 587, 592 (807 SE2d 405) (2017). We conclude that the evidence introduced at trial and summarized above was legally sufficient to enable the jury to find Mangram guilty beyond a reasonable doubt of the crimes of which he was convicted, and so the trial court did not err in denying Mangram's motion for a directed verdict of acquittal. See *Pittman v. State*, 300 Ga. 894, 897-898 (799 SE2d 215) (2017).

III.

Mangram also contends that the trial court erred when it denied his motion for a mistrial after the State elicited testimony from Gillard's grandmother that she had heard that there was a bounty on Gillard's head.

8

Mangram objected to this statement as hearsay and not relevant to show motive without evidence that the defendants were aware of the rumor. The trial court sustained Mangram's objection and instructed the jury to disregard the witness's statement, but denied Mangram's motion for mistrial. Mangram argues that this denial was error warranting a reversal of his convictions. Again, we disagree.

"Whether to grant a motion for mistrial is within the trial court's sound discretion, and the trial court's exercise of that discretion will not be disturbed on appeal unless a mistrial is essential to preserve the defendant's right to a fair trial." *Johnson v. State*, 302 Ga. 774, 782 (809 SE2d 769) (2018) (citation and punctuation omitted). Here, even assuming that the testimony was inadmissible, a mistrial was not necessary to preserve Mangram's right to a fair trial. The trial court sustained Mangram's objection and instructed the jury to disregard the objectionable testimony and allow it to take no part in deliberations. Absent proof to the contrary, we presume that the jury followed this curative instruction. See *Cannon v. State*, 302 Ga. 327, 329 (806 SE2d 584) (2017).

There is no indication that the jury in this case ignored the court's instruction and considered the excluded testimony in arriving at its verdict.

Contrary to Mangram's assertion, the grandmother's statement about a rumor of a bounty on Gillard's head was not the only evidence of malice supporting the guilty verdict on the malice murder charge.[3]  "The malice necessary to establish malice murder may be formed in an instant, as long as it is present at the time of the killing." *Moran v. State*, 302 Ga. 162, 164 (805 SE2d 856) (2017).  Malice may be shown either by proof of the defendant's deliberate intention to kill unlawfully or by evidence that he "acted where no considerable provocation appears and where all the circumstances of the killing show an abandoned and malignant heart." Id. (citation and punctuation omitted).

The evidence introduced at trial showed that Gillard was shot at least once through his left hand and arm, twice in the left side of the head, and once in the back of the neck.  When asked why he shot Gillard, Mangram would only say that Gillard had "played with [Mangram's] people."  This was sufficient to meet the State's burden of proving malice, and along with other evidence presented by the State at trial, made a strong case against

---

[3] In his brief, Mangram appears to equate motive with the essential element of malice. But while evidence of motive is certainly relevant in a murder case, it is not an essential element of the crime of murder, and the State need not introduce evidence of motive in order to support a guilty verdict on the charge of malice murder.  See *Romer v. State*, 293 Ga. 339, 341 (745 SE2d 637) (2013).

Mangram. Under the circumstances, the trial court's curative instruction was sufficient to preserve Mangram's right to a fair trial, and the court did not abuse its discretion in denying his motion for a mistrial. See *Coleman v. State*, 301 Ga. 720, 722-723 (804 SE2d 24) (2017).

Judgment affirmed. All the Justices concur.

Decided August 2, 2018.

Murder. Brantley Superior Court. Before Judge Gillis.

J. Clayton Culp, for appellant.

George E. Barnhill, District Attorney, Michelle C. McIntire, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Scott O. Teague, Assistant Attorney General, for appellee.