307 Ga. 37
FINAL COPY

S19A1042. SCOTT v. THE STATE.

PETERSON, Justice.

Corduray Keith Scott appeals from his convictions for felony murder and cruelty to children in the second degree in connection with the death of his three-month-old son, Corduray Scott Jr.[1] Scott challenges the sufficiency of the evidence to support his convictions and also argues that the trial court erred in admitting statements he gave during his second interview with law enforcement because,

---

[1] The crimes occurred in January 2010. In August 2012, a Richmond County grand jury indicted Scott for malice murder, felony murder (predicated on cruelty to children in the second degree), and four counts of cruelty to children in the second degree. Following a jury trial held later that month, Scott was found guilty of felony murder and one count of cruelty to children in the second degree. The trial court sentenced Scott to life without parole on the felony murder count and a ten-year consecutive term for cruelty to children. On February 5, 2018, Scott was granted an out-of-time appeal after filing a habeas corpus petition, and he filed a notice of appeal about two weeks later. We dismissed his appeal for lack of jurisdiction because Scott filed his notice of appeal in the wrong county. Meanwhile, Scott had filed a separate notice of appeal in January 2018, but we struck the case from the docket in August 2018 and remanded to the trial court for completion of the record. Upon completion of the record, Scott's appeal was redocketed to this Court's August 2019 term and submitted for a decision on the briefs.

although he was properly advised of and waived his *Miranda* rights before his first interview, he was not reminded of his rights prior to the start of the second interview. We affirm Scott's convictions because the evidence was sufficient to support them and there was no *Miranda* violation.

Viewed in the light most favorable to the jury's verdicts, the trial evidence showed that the victim was born to Scott and Shakeila Jones on September 27, 2009. The couple lived together in an apartment and also had a daughter. The couple alternated taking care of the victim.

In the early morning hours of January 18, 2010, Jones changed the victim's diaper and put the victim in a swing, where the infant sometimes slept. The victim appeared normal and nothing unusual happened earlier that day. Jones went to sleep for a few hours, and Scott was responsible for watching the victim during this time.

When Jones woke up later that day, she checked on the victim and noticed that he was unresponsive, his feet were shaking, his arms were stiff, and his eyelids were half-closed. Jones first called a

nurse hotline and then 911. Jones accompanied the victim to the hospital, while Scott remained at home with the couple's other child.

When the victim arrived at the hospital, he was lethargic, experiencing seizures, and having trouble breathing. Dr. Renuka Mehta, a pediatric expert, treated the victim at the hospital. Dr. Mehta observed bruising on the victim's body and, based on his symptoms, believed that the victim had bleeding in his brain. A CT scan confirmed the doctor's suspicions. The victim also presented with severe retinal hemorrhaging, which Dr. Mehta explained was indicative of severe acceleration and deceleration of the victim's head. The victim stopped breathing because of substantial swelling in his brain and was pronounced clinically brain dead within hours of arrival. He was placed on a ventilator for three days before being taken off life support. In her examination of the victim, Dr. Mehta did not observe any congenital or birth defects that would have caused or contributed to his injuries.

The medical examiner who performed the autopsy observed blunt force trauma that caused bruising under the scalp and a small

fracture of the skull, and significant hemorrhaging in the eyes and some hemorrhaging in the victim's neck that were consistent with violent shaking. The medical examiner determined that the victim's cause of death was blunt force trauma to the head and violent shaking. The medical examiner opined that the victim's fatal head injuries occurred mere hours before his admission to the hospital, because the severity of the victim's injuries would have caused the seizures to begin within hours, and the victim began seizing soon after his admission to the hospital.

The medical examiner also observed older injuries to the victim, including: nine rib fractures at different stages of healing that were consistent with a very forceful squeezing of the victim's chest; a laceration to the liver that could only be caused by a forceful impact to the abdomen; and old bleeding in the lungs indicative of instances of asphyxia. The medical examiner closely examined the victim's bones and found no evidence of rickets or Vitamin D deficiency that could have explained why the victim had so many bone fractures. The medical examiner, Dr. Mehta, and another

pediatrician specializing in child abuse all opined that the victim's injuries were intentionally inflicted and non-accidental.

Police briefly spoke to Jones at the hospital and later brought Jones and Scott into the police station for questioning on January 18, 2010. An investigator read Scott his *Miranda* rights at the beginning of the interview, and Scott agreed to answer questions after waiving his rights. During the interview, Scott exhibited odd behavior by smiling and laughing and displayed no emotion when told that his child might be dead. Scott claimed that the victim was injured when the swing broke and the baby fell from it.

The investigator re-interviewed Scott the next day after the investigator talked to the hospital doctors and learned the full extent of the victim's injuries, including evidence of chronic abuse. Before beginning the interview, the investigator reminded Scott of his *Miranda* rights, although he testified that he did not go back over them in detail, and Scott confirmed that he understood his rights. During the second interview, which was video recorded, Scott recounted several instances where the victim had been hurt: one

5

instance where the victim rolled off the bed; one instance where the victim was found facedown on the couch; and another instance in which the victim hit his head against a doorframe while being carried by Scott. In the instance where the infant victim was found facedown on the couch, Scott explained that he put the infant in the corner of the couch, went to use the restroom, and, when he returned about ten to fifteen minutes later, the infant was facedown and his face had begun to change colors due to a lack of oxygen.

Using a doll provided by the investigator, Scott also demonstrated how he played "rough" with the three-month-old child, which included tossing the infant up into the air, squeezing the infant, and bouncing with the baby. The medical examiner reviewed the video-recorded demonstration and concluded that the actions Scott demonstrated were not "extensive" enough to produce the amount of force that caused the victim's injuries. Dr. Mehta similarly testified that Scott's self-reported actions would have had to be more exaggerated than displayed in the video recording in order to cause the victim's injuries.

Scott testified in his own defense at trial. He denied ever intentionally hurting the victim and claimed that he was telling the truth when he told the detective that the only thing that happened on the day of the victim's death was that the victim fell when the swing broke. He admitted that he once left the victim unattended on the couch for about ten to fifteen minutes in order to use the restroom and found the victim facedown struggling to breathe and changing color due to a lack of oxygen.

1. Scott argues that the trial court erred in denying his motion for a directed verdict of acquittal on the counts for which he was convicted. We disagree.

When reviewing the denial of a motion for directed verdict of acquittal, we apply the same standard used to evaluate the sufficiency of the evidence supporting a guilty verdict under *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979). See *Smith v. State*, 304 Ga. 752, 754 (822 SE2d 220) (2018). Under that standard, we view the evidence in the light most favorable to the verdicts and ask whether any rational trier of fact could have found

the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted. See id. (citing *Jackson*). Questions concerning witness credibility, conflicts in the evidence, and the weight of the evidence are for the jury to resolve. See *State v. Cash*, 302 Ga. 587, 592 (807 SE2d 405) (2017). Applying the *Jackson* standard, the trial evidence was sufficient to support Scott's convictions.

(a) There is sufficient evidence to support the felony murder conviction. The trial evidence showed that the victim had been behaving normally prior to being left under Scott's care. When Jones, the mother, next checked on the victim, the victim was unresponsive, his feet were shaking, and his arms were stiff. The victim was taken to the hospital where he began having seizures, was soon pronounced brain dead, and was taken off life support three days later. The medical examiner testified that the victim's fatal injuries occurred within several hours before he was admitted to the hospital, which would have been during the time Scott was the sole caretaker.

Although Scott points to the inability of multiple experts to identify the exact manner in which the victim's injuries were inflicted, Scott admitted that he was "rough" with the victim during the time he took care of him. He also demonstrated in a video recording played to the jury that he tossed the three-month-old into the air and squeezed the victim. Despite Scott's claim that the victim suffered the fatal injuries when the swing accidentally broke and his reliance on his own expert's testimony that it was not possible to determine whether the trauma was accidental or intentionally inflicted, the State's experts concluded that the victim's injuries were non-accidental. The jury was authorized to reject Scott's evidence and theory and resolve any conflicts in the evidence adversely to him. See *Gomez v. State*, 301 Ga. 445, 453 (3) (801 SE2d 847) (2017) ("The jury also was authorized to reject as unreasonable Appellants' hypothesis that [the victim] injured herself in an accident.").

(b) There also is sufficient evidence to support the cruelty to children in the second degree conviction. The indictment alleged

that Scott left the victim unattended on a sofa, which allowed the victim to fall between the cushions, thus preventing the victim from breathing. At trial, the State relied on Scott's admissions that he left the victim on the couch for ten to fifteen minutes while he used the restroom and, when he came back, the victim was facedown and unable to breathe, causing his face to change colors as a result. Scott argues that the evidence was insufficient to show that Scott left the infant completely unsupervised, pointing to his statement to police that Jones was "there" at the time. But there was evidence from which the jury could conclude that Scott left the victim unattended, as Scott and Jones both said that they alternated shifts in caring for the child.

A conviction for cruelty to children in the second degree requires proof that the defendant "with criminal negligence cause[d] a child under the age of 18 cruel or excessive physical or mental pain." OCGA § 16-5-70 (c). And "criminal negligence" is "an act or failure to act which demonstrates a willful, wanton, or reckless disregard for the safety of others who might reasonably be expected

10

to be injured thereby." OCGA § 16-2-1 (b); see also *Daniels v. State*, 264 Ga. 460, 464 (2) (b) (448 SE2d 185) (1994) ("As a basis for liability, criminal negligence is the reckless disregard of consequences, or a heedless indifference to the rights and safety of others, and a reasonable foresight that injury would probably result." (citation and punctuation omitted)). Merely leaving a child unattended for a period of time □ without more □ might not be enough to show criminal negligence. See, e.g., *Corvi v. State*, 296 Ga. 557, 560-561 (1) (769 SE2d 388) (2015) (reversing conviction for cruelty to children in the second degree based on the drowning of two five-year-old children while nanny took a 45-minute phone call because the nanny left children in a bedroom and told them not to go swimming in pool, the children had not shown a propensity to disobey, and there was no evidence that the length of phone call made any difference to the children's deaths). But there is more here.

Scott told the police and testified at trial that he placed the child in the corner of the sofa, implying that the child was secure.

11

But the jury also heard Scott's dubious accounts of previously leaving the child unattended on a bed,[2] as well as his attempts to explain the victim's death as being caused by a fall from a swing and the severe and ongoing trauma as merely being the result of falling from a bed or "rough" playing. Juries are always authorized to disbelieve witnesses, and that authority is certainly not less in cases like this one where the credibility of the witness's testimony has been seriously challenged as to related matters. The jury was authorized to believe Scott's testimony that he left the child unattended on a couch for 15 minutes, but disbelieve his testimony that he secured the child into the corner of the couch before leaving him. See *Hines v. State*, 254 Ga. 386, 387 (2) (329 SE2d 479) (1985) ("The jury is entitled to believe a part of the testimony of a witness and disbelieve other parts." (citation and punctuation omitted)). The jury was also authorized to conclude that Scott's failure to secure a

---

[2] Scott initially claimed that he left the child, then two months old, in the center of a queen-sized bed and the child moved toward the edge and fell off. When the investigator expressed doubts that the young child could move that far, Scott said his child was "very advanced" and conceded that the child was not placed in the "very middle."

very young infant before leaving the child on a couch for 15 minutes while he used the restroom exposed the infant to an obvious risk of injury by being smothered by couch cushions. And the jury was authorized to conclude that leaving an infant unattended for 15 minutes in the face of such a risk showed Scott's reckless disregard for the child's safety.

2. Scott does not dispute that he was advised fully of his *Miranda* rights prior to the first custodial interview, but argues that the trial court erred in admitting statements from his second custodial interview conducted the next day, because Scott was not reminded of his rights. Scott's claim fails.

There is no dispute that the second interview occurred the day after and was a continuation of the first interview. The investigator testified that he reminded Scott of his *Miranda* rights prior to the second interview. Under these circumstances, the investigator was not required to repeat the *Miranda* warnings. See, e.g., *Ellis v. State*, 299 Ga. 645, 648 (2) (791 SE2d 16) (2016) ("Neither federal nor Georgia law mandates that an accused be continually reminded of

13

his rights once he has intelligently waived them." (citations and punctuation omitted)); *Walker v. State*, 296 Ga. 161, 170-171 (3) (a) (766 SE2d 28) (2014) ("[T]here is no duty to repeat *Miranda* warnings for a follow-up interview that is part of a continuing interrogation."). The trial court made no explicit factual findings or credibility determinations on the record, but by ruling that the statement was voluntary, the court implicitly credited the investigator's testimony, as it was authorized to do, to conclude that Scott was reminded of his rights. See *Butler v. State*, 292 Ga. 400, 403 (2) (738 SE2d 74) (2013) ("Unless clearly erroneous, a trial court's findings as to factual determinations and credibility relating to the admissibility of the defendant's statement . . . will be upheld on appeal." (citation and punctuation omitted)).

*Judgment affirmed. All the Justices concur.*

DECIDED OCTOBER 7, 2019.
Murder. Richmond Superior Court. Before Judge Jolly.
*Brownstone, P.A., Robert L. Sirianni, Jr.*, for appellant.

*Henry W. Syms, Jr., Kelly J. Weathers, Joshua B. Smith, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General*, for appellee.