NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided:  April 16, 2024

S24A0068.  MILTON v. THE STATE.

MCMILLIAN, Justice.

Jarvis Lamont Milton was convicted of murder and other crimes in connection with the shooting death of Frederick Cade.[1]

---

[1] Frederick Cade was killed on the night of August 13-14, 2017. Milton and Richard Stroud, Jr., were indicted by a Wilkes County grand jury on February 4, 2019, individually and as parties to a crime and co-conspirators, on charges of violating the Street Gang Terrorism and Prevention Act (Count 1), malice murder (Count 2), felony murder (Count 3), possession of a firearm in the commission of a crime (Count 4), and aggravated assault (Count 5). After Stroud's case was severed, Milton was tried before a jury in May 2019 and found guilty on all counts. On May 10, 2019, the trial court sentenced Milton to life in prison, without the possibility of parole on Count 2 and to five years in prison on Count 4, to run consecutively to Count 2. Counts 1 and 5 were merged into Count 2 for sentencing purposes, and Count 3 was vacated by operation of law. Although it appears that the Gang Act charge was improperly merged into the murder conviction, see *Lupoe v. State*, 300 Ga. 233, 239 (1) (794 SE2d 67) (2016) ("[T]he gang activity counts did not merge as that crime and malice murder each require proof of an element that the other does not."), we decline to exercise our discretion to correct that merger error, which has not been raised by the State. See *Dixon v. State*, 302 Ga. 691, 698 (4) (808 SE2d 696) (2017) ("[W]e have determined that, when a merger error benefits a defendant and the State fails to raise it by cross-appeal, we henceforth will exercise our discretion to correct the error upon our own initiative only in

Milton appeals his convictions, asserting in his sole enumeration of error that the evidence presented at trial was not sufficient for a rational trier of fact to find him guilty beyond a reasonable doubt of the crimes of which he was convicted as required by *Jackson v. Virginia*, 443 U.S. 307 (99 SCt 2781, 61 LE2d 560) (1979). We affirm for the reasons that follow.

1. The evidence at trial showed that in August 2017, Cade was married to Shakevia Graves, who had an eight-year-old son, D.G., with Milton's co-indictee, Richard Stroud, Jr. At that time, Milton had been dating Shakevia's twin sister, Shanevia ("NeNe") Graves for six to seven years.[2] Shakevia and Cade's marriage was volatile.

---

exceptional circumstances."). Stroud was tried separately in November 2019, and his appeal is before this Court as Case No. S24A0069.

Milton filed a motion for new trial on May 28, 2019, and a second motion asserting the same grounds on June 26, 2019; an amended motion for new trial was filed on August 15, 2022. The trial court denied Milton's motion as amended on July 20, 2023. Milton filed a notice of appeal on July 28, 2023, and an amended notice of appeal on August 9, 2023. This appeal was docketed to the term of this Court beginning in December 2023 and submitted for a decision on the briefs.

[2] Because the Graves sisters' names are so similar and to avoid confusion, we will refer to Shakevia by her full name and Shanevia by her nickname, "NeNe," which is how the witnesses and counsel primarily referred to her at trial.

The two would often argue and their arguments would sometimes turn physical. As a result, Shakevia often stayed at her grandparents' house, which was where NeNe was living. Shakevia testified that there was "bad blood" between Cade and Stroud because Cade was jealous of the time Shakevia spent with Stroud and that the two men also argued over Stroud's failure to contribute to D.G.'s support.

On Sunday, August 13, 2017, Cade and Shakevia were not getting along and Shakevia had spent the prior week at her grandparents' house. That Sunday night, she and NeNe decided to drive to a nearby business. While they were parked there, they saw Cade driving up in his truck, and the sisters sped off, with Shakevia driving. Cade followed them, and both vehicles drove through the neighborhood until Shakevia pulled into her grandparents' house. Cade pulled behind the sisters' car but did not get out and instead drove away.

In the interim, NeNe texted Milton to bring them cigarettes, and a short time later Stroud drove Milton to the grandparents'

3

house in Stroud's car. NeNe got into the backseat of Stroud's car, while Shakevia approached the car to get a cigarette. As Shakevia leaned inside the car, Cade "came out of nowhere" and pushed Shakevia from behind. Both Shakevia and Cade fell inside the backseat of Stroud's car still "tussling." Shakevia got out of the car and ran to the porch of the house, with Cade following her.

As this altercation was occurring, Stroud and Milton were telling Cade to stop. Milton told Cade that he was "f**ked up about [himself] for putting [his] hands on [Shakevia] in front of her grandma," and Milton called Cade a "p***y n****r" for doing that. Stroud argued with Cade for fighting Shakevia, his "baby mama," in Stroud's car. When the sisters' grandparents came out of the house in response to the altercation, Stroud escorted Cade off the porch, and Cade walked away. Shakevia testified that Stroud, Milton, and NeNe then drove away in Stroud's car in the direction opposite from where Cade was walking. Shakevia stayed behind and began repeatedly calling and texting Cade but never got a response.

Shakevia testified that NeNe returned to the house "in a rage"

and "cussing" less than an hour after she left. NeNe told Shakevia that Shakevia was "stupid as hell" for calling Cade's phone "while they up there fighting." When Shakevia asked what had happened, NeNe did not answer, but only said that "you and everybody else going to know what happened to him tomorrow."

Cade's body was discovered early on the morning of August 14, 2017, lying on the pavement in an isolated area near the grandparents' house. Witnesses at the scene, including attending medical personnel and police investigators, observed that Cade appeared to have suffered at least one gunshot wound to the arm and that he also had an injury to his torso. Emergency medical services personnel called to the scene detected no signs of life. Investigators also observed that Cade's body and clothing were muddy. And they discovered muddy shoe prints and a blood trail beginning near a muddy area on the side of the road about 20 yards from Cade's body. The blood trail ended at the body, suggesting that Cade had traveled for some distance before collapsing to the pavement. Blood samples taken from the blood trail on the roadway

were later identified as matching a blood sample obtained from Cade's body during his autopsy.

Agents from the Georgia Bureau of Investigation ("GBI") arrived at the grandparents' house around 5:00 a.m. to inform Shakevia that Cade was dead. Afterwards, NeNe and Shakevia were interviewed at the Wilkes County Sheriff's office by GBI Agents Derrick Glasco and Austin Bradshaw. Agent Bradshaw first questioned Shakevia at 6:20 a.m., and she told the agent that NeNe had driven away with Stroud and Milton from the house, but she did not know who had shot Cade. Meanwhile, Agent Glasco began interviewing NeNe at 6:43 a.m., and as NeNe acknowledged at trial, her stories "changed numerous . . . times." NeNe first told Glasco about the altercation between Cade and Shakevia, but she never mentioned that Stroud or Milton were at her grandparents' house or that she was with them after the altercation. Instead, NeNe said she smoked a cigarette after the altercation and went into the house.

When Agent Bradshaw joined Agent Glasco and NeNe at around 7:00 a.m., the agents began to video record the interview.

NeNe continued to maintain that she had not left her grandparents' house, although she eventually told the agents that Milton and Stroud were at the house during the altercation between Cade and Shakevia.[3] But when the agents accused NeNe of lying and suggested that she was covering for her boyfriend, Milton NeNe said, "Jarvis [Milton] shot Pooh," which was Cade's nickname. She stated that Stroud and Milton came over to the grandparents' house to pick up NeNe and Shakevia, and as the sisters were getting into the car with the two men, Cade came up behind Shakevia and pushed her in the car, leading to the altercation. NeNe also admitted that she left in Stroud's car with Stroud and Milton after Cade left. NeNe said that as they drove away from the house, Stroud and Milton decided to follow Cade, and they caught up with him walking along the road. When they drove up, Cade began yelling, and Milton and Stroud yelled back. Stroud then said, "F**k it, let's go beat him up." Both Stroud and Milton got out of the car while NeNe stayed in the car. When the two men got out of the car, Cade immediately hit

---

[3] Neither GBI agent had interviewed Stroud or Milton at that point.

Stroud, leading to a "two-on-one" fight, with Stroud and Milton fighting Cade. NeNe then heard a gunshot, but she never saw a gun. She thought Milton shot Cade because she heard Stroud say, "Damn, boy, you done f**ked up." When the three drove away from the scene, NeNe saw Cade running up the road, and he appeared to be holding his arm. Stroud and Milton then took NeNe to her grandparents' house at her request, and she ran inside.

When asked at trial why her stories changed during the interview, NeNe testified that she first said she had not left her grandparents' house because she was scared and nervous and did not want anyone to know that she was at the scene of the shooting or in any way involved. She testified that after the GBI agents told her that her story was false, she told them that Milton shot Cade because she thought that was what they wanted to hear as they had accused her of trying to protect her boyfriend and they were threatening that she could be charged with a crime if she did not tell them what had happened. NeNe said that to avoid being charged she "was willing to tell them anything." Agent Bradshaw testified,

however, that he "just tried to make it clear to her how serious this was, that a man had lost his life, and if she was in the vehicle, her withholding information she could potentially be charged." This portion of NeNe's videotaped interview was played for the jury.[4]

Agent Bradshaw testified that, after he interviewed both sisters that morning, he went back to the crime scene at 8:20 a.m. to view the scene in the daylight, as the area had been dark earlier in the morning. While at the scene, near an area on the side of the road where it looked like the mud had been freshly turned up and the blood trail and muddy shoe prints began, he discovered a gold pendant "jammed up in the mud." Agent Bradshaw later matched the pendant to a profile picture from Stroud's Facebook page, which showed him wearing a necklace with a very similar pendant. The profile picture was posted to Stroud's page on August 3, 2017, ten to

---

[4] The video reflects that Agent Bradshaw told NeNe that he knew she was leaving things out of her story because he had already talked to Shakevia. He told NeNe that the agents knew that she had left the house with Milton and Stroud. Agent Bradshaw told NeNe that she was implicating herself by not being truthful and because a man had died, she could be charged with murder as she was in the car and lied to police about what happened. The agent then posited that NeNe was there when Cade was shot and saw what happened, but she was covering for her boyfriend.

eleven days before Cade was shot.

Agent Bradshaw interviewed Stroud at 8:52 a.m. the same morning. During the interview, Stroud gave the GBI permission to search his car, where investigators located mud and blood smears both inside and outside of the vehicle. A blood smear located on the vehicle's front center console was later determined to match Cade's blood sample. Milton was arrested later that afternoon, and Agent Bradshaw interviewed him at 2:52 p.m. that day. The agent testified that Milton said that after the altercation occurred at the grandparents' house, Stroud drove him and NeNe to Milton's house. Milton said they did not make any stops and denied having any knowledge or involvement in Cade's death.

At Milton's trial, NeNe again changed her story about what happened that night. She testified that Stroud and Milton did not go looking for Cade after they left the grandparents' house, but, instead, they just happened upon him walking in the road. She said Stroud stopped the car, and Stroud and Cade were yelling at each other. Although NeNe stated in her interview that both Milton and

Stroud fought with Cade in a "two-on-one" fight, at trial she testified that Milton tried to be the peacemaker, that he told Stroud, "y'all can deal with that on another time," and that only Stroud fought with Cade. NeNe testified that while Cade and Stroud were fighting, Milton stood beside NeNe's side of the car smoking a cigarette, and that he was still standing there when she heard the gunshot. And unlike in her interview where she said she heard Stroud say, "Damn, boy, you done f**ked up," at trial she testified to hearing Stroud say, after the gunshot, "damn man, I done f**ked up." NeNe testified that she did not see a gun, but when Stroud started walking to the car, she saw that he had his shirt off and was wrapping his hand in the shirt. She could not see what was in his hand, but she said that Stroud placed the wrapped shirt between his legs when he got back into the car. And she testified that she never really saw Cade after that, contrary to her statement in her interview that after the gunshot she saw Cade running away holding his arm.

The medical examiner who performed the autopsy on Cade's body testified that it appeared that a single bullet entered and exited

11

his right arm, then re-entered his right torso where it struck several of his ribs, his right lung, and ultimately his heart, resulting in massive hemorrhaging and death. The medical examiner did not, however, rule out the possibility that the wounds to the arm and the torso could have been made by separate gunshots.

Additionally, the State played DVD recordings of two phone calls Milton made at the jail shortly after his arrest. In the calls, Milton stated that he had been charged with murder and that he needed to get the charge reduced to manslaughter.

2. Milton asserts that the evidence presented at trial was not sufficient for a rational trier of fact to find him guilty beyond a reasonable doubt under *Jackson v. Virginia*.[5] "Under [the *Jackson*] test, we view all of the evidence presented at trial in the light most

---

[5] Although Milton purports to challenge the sufficiency of the evidence as to all the charges of which the jury found him guilty, he was only sentenced on the charges of malice murder and possession of a firearm in the commission of a felony. The other charges were either merged into his murder conviction or vacated. Therefore, his challenges to the sufficiency of the evidence to support those crimes are moot, and we confine our analysis to the evidence presented in support of malice murder and the firearm possession charge. See *Anderson v. State*, 299 Ga. 193, 196 (1) n.4 (787 SE2d 202) (2016) (defendant's claims about sufficiency of evidence were moot for crimes that were vacated or that mergedr).

12

favorable to the verdicts and consider whether any rational juror could have found the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted." *Kirkland v. State*, __ Ga. __, __ (8), 2024 WL 674830, at *13 (Case No. S23A0942, decided Feb. 20, 2024). See also *Jackson*, 443 U. S. at 319 (III) (B); *Fitts v. State*, 312 Ga. 134, 141 (3) (859 SE2d 79) (2021). "This limited review leaves to the jury the resolution of conflicts in the evidence, the weight of the evidence, the credibility of witnesses, and reasonable inferences to be made from basic facts to ultimate facts." *Muse v. State*, 316 Ga. 639, 647 (2) (889 SE2d 885) (2023) (citation and punctuation omitted).

Milton was charged individually and as a party to the crime of malice murder and possession of a firearm during the commission of a crime. "A person commits the offense of murder when he unlawfully and with malice aforethought, either express or implied, causes the death of another human being." OCGA § 16-5-1 (a). And under OCGA §16-11-106 (b) (1), it is unlawful for any person to "have on or within arm's reach of his or her person a firearm . . . during

13

the commission of, or the attempt to commit . . . [a]ny crime against or involving the person of another."

Moreover, "[e]very person concerned in the commission of a crime is a party thereto and may be charged with and convicted of commission of the crime." OCGA § 16-2-20 (a). To obtain a conviction of a person as a party to the crime, the State must prove "that he intentionally aided or abetted in the commission of the crimes or intentionally advised, encouraged, counseled, or procured someone else to commit the crimes." *Frazier v. State*, 308 Ga. 450, 453 (2) (a) (841 SE2d 692) (2020). "Conviction as a party to a crime requires proof of a common criminal intent, which the jury may infer from the defendant's presence, companionship, and conduct with another perpetrator before, during, and after the crimes." *Muse*, 316 Ga. at 648 (2) (citation and punctuation omitted). Thus, to prove Milton guilty of the charges of malice murder and possession of a firearm during the commission of a felony, it was not necessary for the State to prove that Milton personally possessed a weapon or fired a gun at Cade as long as the State proved that Milton was a party to the

14

crimes. See *Scoggins v. State*, 317 Ga. 832, 836-39 (1) (a)-(b) (896 SE2d 476) (2023) (even where evidence did not conclusively establish which of the two defendants shot victim or had a weapon, evidence of a common criminal intent, including defendant's presence, companionship, and conduct before and immediately after the fatal shooting supported convictions as a party to the crimes of malice murder and possession of a firearm).

Upon review of the record, we conclude the evidence at trial, when viewed in the light most favorable to the verdict, was constitutionally sufficient to support Milton's convictions for malice murder and possession of a firearm during the commission of a felony. The State produced evidence that on the morning after Cade was shot, NeNe told police that Milton shot Cade. Although NeNe subsequently testified at trial that Stroud, rather than Milton, was the shooter and that she originally identified Milton as the shooter only because she felt pressured by police to do so, the jurors had the opportunity to review the portion of the video recording leading up to NeNe's identification of Milton as the shooter, and it was up to

15

them to assess her credibility and decide which version to believe. See *Lewis v. State*, 314 Ga. 654, 659 (2) (878 SE2d 467) (2022) (where witness provided conflicting testimony at trial about the events surrounding the shooting and the identity of the shooter, it "was for the jury to assess the credibility of the witnesses" and "to resolve any discrepancies in the evidence presented at trial." (citation and punctuation omitted)).

Moreover, even if the jury had concluded that Stroud was the shooter, the evidence was sufficient to find Milton guilty as a party to the crime. NeNe initially told police that Stroud and Milton went looking for Cade together after they had both argued with him and that Stroud and Milton fought Cade together two-on-one after Stroud said, "let's go beat him up."[6] Milton and Stroud also left the scene together in Stroud's car after Cade was shot, and Cade's blood was found inside Stroud's car. After his arrest, Milton lied to police about what happened on the night of the shooting. Thus, the

---

[6]Although NeNe testified at trial that they came upon Cade by chance and only Stroud fought Cade, it was for the jury to resolve this conflict. See *Lewis*, 314 Ga. at 659.

16

evidence supported Milton's presence and active participation before, during, and after the commission of the crimes.

We conclude that this and other evidence at trial was more than sufficient to authorize the jury to find Milton guilty beyond a reasonable doubt of the crimes of malice murder and possession of a firearm during the commission of a crime, either as the shooter or as a party to the crimes. See *Scoggins*, 317 Ga. at 836-39 (1) (a)-(b); *State v. Cash*, 302 Ga. 587, 595-96 (807 SE2d 405) (2017) (evidence including that the defendant assented to and lent approval to the commission of the crime by a co-defendant and lied to police after the crime was sufficient to support the jury's finding that the defendant aided and abetted the crime); *Williams v. State*, 291 Ga. 501, 504 (1) (c) (732 SE2d 47) (2012) (concluding that the evidence established that defendant was a party to the crime where it showed that he was present when the crimes were committed and the jury could infer from his conduct before and after the crimes that he shared a common criminal intent with the actual perpetrators); *Johnson v. State*, 276 Ga. 368, 371 (1) (578 SE2d 885) (2003)

17

(although the evidence showed that weapon was in the physical possession of defendant's co-indictee, defendant is guilty of possession of a firearm during the commission of a felony where defendant was accomplice of the person who was in physical possession of the pistol).

*Judgment affirmed. All the Justices concur.*