304 Ga. 363
FINAL COPY

S18A1138. SLOANS v. THE STATE.

BOGGS, Justice.

Appellant Levaughn Sloans was tried before a jury and found guilty of murder, felony murder, criminal damage to property in the first degree, aggravated assault, and possession of a firearm during the commission of a crime related to the death of Antonio President.[1] He now appeals, asserting that the evidence was insufficient and that he received ineffective assistance of counsel. We disagree on both grounds and affirm.

---

[1] The crimes occurred on May 1, 2008. On February 24, 2009, a Richmond County grand jury indicted Sloans on charges of murder, felony murder, criminal damage to property in the first degree, aggravated assault (of a second victim, Walter Jones III), and possession of a firearm during the commission of a crime (three counts). Following a September 13-16, 2010 trial, the jury found him guilty on all counts, and he was sentenced to life plus 30 years in prison. The trial court purported to merge the felony murder count into the malice murder count instead of noting that it was vacated by operation of law. Sloans' motion for new trial was filed on October 7, 2010, amended by Sloans acting pro se on July 5, 2013, amended by new counsel on January 5, 2016, and denied on July 29, 2016. This case was docketed in this Court for the August 2018 term and submitted for a decision on the briefs. We note that this is yet another case with an inordinate delay in ruling on the motion for new trial. See Owens v. State, 303 Ga. 254, 258-260 (4) (811 SE2d 420) (2018).

The record reveals that Stephen Smith drove to Sloans and Anthony Folston's apartment in order to satisfy a drug debt. While there, Smith overheard Folston tell Sloans, "[h]e's at the store, he's at the store right now, he's there right now, he's there right now, you need to go, you need to go handle it, straighten it right now." Smith saw Folston hand Sloans a silver revolver, and Sloans put on a black jacket before he left. Smith got back in his vehicle and drove to Sonny's Corner Package Shop, where he saw Sloans and Folston inside a green Cadillac near the store. Smith testified that Sloans jumped out of the car and ran to the side of the store. He then heard gunshots, but he did not turn around and instead "just kept on going." Bruce Benziger, who had purchased cocaine from Sloans on several occasions, was standing outside the convenience store when he "heard some shots." He "turned around and looked and [Sloans] was coming around the corner with a gun shooting off . . . the other guy he done had hit was [the victim]." Another witness, Walter Jones III, testified that he was talking with the victim when a man wearing a hood came up to them and pulled out a chrome gun. Jones thought the gun was "aimed for [him]" so he turned around and ran, but then realized that the man "shot [the victim]." However, Jones was never able to identify the shooter.

2

At the time of the shooting, Taisha Wesley was pulling into the convenience store parking lot with her three children. One of the bullets knocked out her front tire. She drove off but returned later and told police what she had seen. A few days later, she identified Sloans as the shooter after being shown a photographic lineup. Wesley's son, who knew the victim, also identified Sloans as the shooter.

Investigators found a black hooded jacket in the area of the shooting. It was given to the GBI for DNA testing but was never tested. Police interviewed both Folston and Sloans, and both admitted that they sold drugs from their apartment. Sloans denied shooting the victim but told police that the victim had robbed Folston months earlier. Police recorded a phone call between Sloans and Folston after their arrest. During the call, the two discussed the fact that police took .45 caliber rounds from their apartment, to which one of them responded "okay, we're straight." The projectile that killed the victim was a .38 caliber bullet.

1. Sloans argues that the evidence was insufficient to sustain his convictions. When evaluating a challenge to the sufficiency of the evidence, this Court views all of the evidence admitted at trial in the light most favorable to the

3

verdicts and asks whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted. Hayes v. State, 292 Ga. 506 (739 SE2d 313) (2013).

Sloans asserts that the evidence was insufficient because there was no DNA evidence placing him at the scene, the testimony of the police officers was unreliable, and Smith's testimony was not credible because he was incarcerated at the time of his second statement to police and when he testified at Sloans' trial. However, "[o]ur limited review leaves to the jury the resolution of conflicts in the evidence, the weight of the evidence, the credibility of witnesses, and reasonable inferences to be made from basic facts to ultimate facts." (Citations and punctuation omitted.) McGruder v. State, 303 Ga. 588, 590 (II) (814 SE2d 293) (2018). Likewise, Sloans' argument concerning the lack of DNA evidence is also without merit. "Although the State is required to prove its case with competent evidence, there is no requirement that it prove its case with any particular sort of evidence." (Citation and punctuation omitted.) Jordan v. State, 303 Ga. 709, 711 (1) (814 SE2d 682) (2018).

Sloans argues further that there was no evidence presented as to the value of the property to sustain his conviction for criminal damage to property in the

4

first degree — one of the crimes for which he was indicted. While one manner of committing second degree damage to property requires proof of value,[2] first degree damage to property does not. The State was therefore not required to prove the value of the damage to Wesley's car. OCGA § 16-7-22 (a) (1) provides: "A person commits the offense of criminal damage to property in the first degree when he . . . [k]nowingly and without authority interferes with any property in a manner so as to endanger human life." We have "construe[d] the phrase 'in a manner so as to endanger human life' to mean reckless endangerment rather than actual endangerment." Carthern v. State, 272 Ga. 378, 381 (529 SE2d 617) (2000). Here, Wesley testified that, after she "pulled up" and was about to get out of the car, "[a] guy came around the building and started shooting so . . . I told the kids to get back in the car. So we got back in the car . . . when I was backing up we got back down the road. I saw that my tire

---

[2] A person commits the offense of criminal damage to property in the second degree when he: (1) Intentionally damages any property of another person without his consent and the damage thereto exceeds $500.00; or (2) Recklessly or intentionally, by means of fire or explosive, damages property of another person. OCGA § 16-7-23 (a).

5

was shot. So I had to pull over and get somebody to change my tire." Wesley's son, who was a passenger in the car, explained that, as his mother drove away from the convenience store, they had to stop because they "had a flat tire." Although this was circumstantial evidence that at least one of the shots fired by Sloans struck Wesley's car while she and her children were inside or immediately near the car, thereby endangering them, it was for the jury to determine whether such evidence excluded every other reasonable hypothesis but that of Sloans' guilt. See Wilson v. State, 344 Ga. App. 285, 287-288 (1) (b) (810 SE2d 303) (2018) (evidence sufficient to sustain conviction for first degree criminal damage to property when defendant shot gun in direction of victim's vehicle and five-lane road with a steady flow of traffic, recklessly endangering the lives of people on the road).

The evidence presented here was sufficient for a rational trier of fact to find Sloans guilty beyond a reasonable doubt of the crimes of which he was convicted.

2. Sloans complains that he received ineffective assistance of trial counsel because counsel did not properly object to the admission of autopsy photographs at trial. To prevail on his claim of ineffective assistance of counsel under

6

Strickland v. Washington, 466 U. S. 668 (104 SCt 2052, 80 LE2d 674) (1984), Sloans must show both that counsel's performance was deficient and that the deficient performance prejudiced the defense. "To prove deficient performance, Appellant must show that his lawyer performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." Romer v. State, 293 Ga. 339, 344 (3) (745 SE2d 637) (2013). The prejudice prong requires a defendant to show "a reasonable probability sufficient to undermine confidence in the outcome that, but for counsel's alleged unprofessional errors, the result of the proceeding would have been different." (Citations and punctuation omitted.) Miller v. State, 285 Ga. 285, 286 (676 SE2d 173) (2009). "If an appellant fails to meet either prong of the Strickland test, it is not incumbent upon this Court to examine the other prong." Dunn v. State, 291 Ga. 551, 553 (4) (732 SE2d 524) (2012).

The record reveals that, before the medical examiner, Dr. Eric Eason, took the stand, the prosecutor informed the trial court and defense counsel that the medical examiner brought autopsy photographs with him, and he wished to use those photographs in his testimony. The prosecutor explained that he had not been provided with the photographs earlier and, therefore, did not provide

7

"advance[ ] copies of those photographs to the defense," and he had just shown them to defense counsel "in the last five minutes or so." Defense counsel objected to the use of the photographs because she did not receive them ten days before trial and, therefore, was unable to consult with another doctor about them.

The trial court asked defense counsel if she wanted time to inspect the photographs and question the medical examiner outside of the presence of the jury. The court offered defense counsel "a lengthy recess," and counsel asked for a minute to consult with co-counsel. After doing so, counsel asked for an "extended lunch period" to consider the photographs. During the colloquy that followed, the prosecutor asked defense counsel if "the objection [was] just to the fact that [the victim's] penis was depicted" in the photographs. Defense counsel responded, "No. It's about the fact that there are four pictures on each of the slides, and we're contesting some of them, and if they were separated and provided to us ten days prior, then we could have taken care of this." The parties agreed to allow the medical examiner to first explain the photographs outside of the presence of the jury.

The doctor explained that the autopsy photographs would be helpful in

demonstrating where the victim's wounds were located, but he agreed that only four of the twelve photographs would be needed for that purpose. Trial counsel believed that the photographs would not be admissible "when it comes to [the doctor] going over exactly his autopsy, what he performed, what he found out," and because they depicted an apparatus that the paramedics placed in the victim's side to try to resuscitate him. Counsel maintained that she needed more time to determine whether, "based on the law, we can exclude some of the pictures." The trial court ruled that the apparatus did not render the photographs inadmissible and that the photographs were not grotesque.[3] The court announced that rather than delay the trial, it would give the defense an opportunity to look at the photographs again so that she could "make some specific objection."

---

[3] See Stuckey v. State, 301 Ga. 767, 772-773 (2) (c) (804 SE2d 76) (2017) ("Under Georgia's old Evidence Code, which was in effect at the time this case was tried, pre-autopsy incision photographs like these, which 'showed different angles of the scene, the position of the victim's body … , and the nature, location, and extent of the victim's wounds,' were admissible, even if they were graphic and somewhat duplicative." (citation and punctuation omitted)); Banks v. State, 281 Ga. 678, 680 (2) (642 SE2d 679) (2007) ("Post-incision autopsy photographs 'are admissible if necessary to show some material fact that becomes apparent only due to the autopsy.' [Cit.]"). It appears from the photographs admitted (and the doctor's testimony) that they were taken before the doctor made incisions on the victim's body.

When counsel asked if the court had ruled on her request for a "one-hour continuance," the trial court responded that it was not inclined to give the defense more time to consider the photographs and that the defense also had the autopsy reports. After some further discussion, the court, in denying defense counsel a continuance, ruled that the four photographs were "reasonably necessary for the doctor to explain the nature and location of the wounds" and that there was nothing "inflammatory" about the photographs. When the State sought to admit the photographs during the doctor's testimony, counsel again objected "based on violation of OCGA [§] 17-16-1, the ten-day violation, as we received those photographs this morning at 11:00 a.m." The court overruled the objection.

Sloans argues that his counsel should have objected to the autopsy photographs *solely* on the ground that they were not provided to the defense ten days prior to trial, rather than basing her objection on "a denied request for continuance to research the law."

It is true, as Sloans points out, that pursuant to OCGA § 17-16-4 (a), the State was required to provide the defense with a copy of the photographs no later than ten days prior to trial. However, when the State fails to comply with

10

these requirements, the "court may order the state to permit the discovery or inspection, interview of the witness, grant a continuance, or, upon a showing of prejudice and bad faith, prohibit the state from introducing the evidence not disclosed." OCGA § 17-16-6. Counsel objected to the use of the photographs on several grounds and more than once on the ground that they were not provided to the defense ten days prior to trial. In accordance with the options provided in OCGA § 17-16-6, the trial court offered to allow defense counsel to inspect the photographs, prior to the doctor taking the stand, as a remedy for the State's failure to comply with OCGA § 17-16-4 (a), and it appears from the record that counsel reviewed the photographs. Sloans has not shown that counsel performed in an objectively unreasonable way by objecting to the autopsy photographs on several grounds, rather than urging only one of those grounds, especially here where the trial court asked defense counsel for specific objections. Further, Sloans has made no showing that, had counsel objected *solely* on this ground, there is a reasonable probability that the outcome of his trial would have been different, especially considering the totality of the evidence presented. See Revere v. State, 302 Ga. 44, 49 (2) (a) (805 SE2d 69) (2017). Sloans has therefore failed to establish, under either prong of the

11

Strickland standard, that he received ineffective assistance of counsel on the ground asserted.

Judgment affirmed. Hines, C. J., Melton, P. J., Benham, Hunstein, Nahmias, Blackwell, and Peterson, JJ., concur.

Decided August 27, 2018.

Murder. Richmond Superior Court. Before Judge Annis.

Aaron S. Palmer, for appellant.

Natalie S. Paine, District Attorney, Joshua B. Smith, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Scott O. Teague, Assistant Attorney General, for appellee.