305 Ga. 577
FINAL COPY

S18A1137.  THE STATE v. TEDDER.

BETHEL, Justice.

Following an October 2015 trial, a jury found Appellee Dolonte Tedder guilty of murder and other crimes in connection with the shooting death of Quleon Glass.  In January 2017, Tedder filed a motion for new trial, which included arguments that he received ineffective assistance of counsel in several regards, that insufficient evidence supported the jury's verdict on a count of criminal gang activity, and that the State committed a Brady violation.  In September 2017, the trial court granted Tedder's motion for new trial on the ground of ineffective assistance of counsel due to trial counsel's failure to introduce expert testimony that would have contradicted part of the State's theory of the case.  It did not rule on Tedder's other enumerated grounds for a new trial.  The State appeals from that decision.  Because we find that the trial court erred, we reverse the order granting Tedder a new trial and remand this case to the trial court for consideration of the remaining grounds for new trial set forth in Tedder's amended motion.

On December 12, 2014, a Fulton County grand jury indicted Tedder, along with Jacquavious Eggleston and Teandria Tabb, for the shooting death of Quleon Glass. Specifically, the three were charged with malice murder, three counts of felony murder, two counts of aggravated assault, and possession of a firearm during the commission of a felony. Additionally, Eggleston and Tedder were charged with participation in a criminal street gang, and Eggleston was charged with making a false statement to the College Park Police Department.

Tedder was tried alone before a jury from October 26 to October 28, 2015. Eggleston and Tabb pleaded guilty and testified for the State regarding the series of events that culminated in Glass's death. Tabb testified that, on the afternoon of September 8, 2014, she was hanging out with her boyfriend Glass and his friend Tedder. During that time, Glass received a call from Eggleston, who wanted a ride to a College Park apartment complex.[1] Tabb, Glass, and Tedder then got into Tabb's vehicle and drove to pick up Eggleston. When the four arrived at the College Park apartment complex, Eggleston exited the vehicle to speak to a group congregated around several parked cars. Shortly

---

[1] Tabb explained that she used her vehicle to operate a shuttle of sorts for Glass's friends, who exchanged rides for gas money.

thereafter, Glass exited the vehicle, as did Tedder, who did not appear to know the people outside the vehicle. Ten minutes later, Eggleston, Glass, and Tedder reentered the car, and Glass instructed Tabb to follow two other cars. Glass was sitting in the front passenger seat, Eggleston was sitting behind Tabb, and Tedder was sitting behind Glass.

Tabb testified that she followed the cars to a house near Godby Road, where all three cars parked, and Eggleston again exited the car to speak with people outside the house. When he returned, Eggleston instructed Tabb to continue following the other two cars. The other cars drove erratically, and, when Tabb would lose track of them, Eggleston used his phone to communicate with persons in the other cars to find out where to meet up. No one in the car questioned what was happening or asked to be let out of the car. According to Tabb, she continued driving, directed by Eggleston, for about twenty minutes, during which time she came to the conclusion that the purpose of the drive was to locate a certain group of people.[2] At some point during the

___

[2] Tabb testified that she came to this conclusion because she heard someone in the back of the car make statements such as, "we can't find them," "they're not here no more," "they just not out here," and "let's just go . . . they ran, they're not out here no more." Tabb believed it was Eggleston who made these statements, and she, once again, testified that no one else in the car questioned these statements or asked to be let out of the car.

drive, Tabb stopped at a light on Godby Road. While at the light, she heard Glass say "you just want to shoot at them."[3] Tabb recalled that no one in the car seemed surprised by, objected to, or questioned Glass's statement.

When the light turned green, Tabb drove the car through the intersection, and, shortly thereafter, Tabb heard gunshots ring from Glass's weapon.[4] When Tabb heard Glass fire his gun, she also saw, in her peripheral vision, Eggleston stand up through her open sunroof. Tabb could not see what Tedder was doing or whether he had a gun due to a large laundry basket obstructing her vision. During the commotion, she also recalled hearing someone yell, "They were shooting back, they were shooting back." Tabb did not see that Glass was wounded until after she drove away from the shooting.

Eggleston testified that he and Glass were friends and fellow members of "Yung Fame," which Eggleston characterized as a rap group but which a detective with the College Park Police Department characterized as having been known to be involved in "gang activity." Eggleston stated that Tedder was not a member of Yung Fame, that he did not know Tedder, and that he

---

[3] Neither Tabb's nor Eggleston's trial testimony indicated whom Glass was referencing with this statement.

[4] Tabb testified that Glass "carried a weapon everywhere."

first met Tedder on the day of Glass's death. Eggleston explained that, while at the College Park apartment complex, he was speaking with other Yung Fame members regarding an attempt earlier in the day by a member of the Sex Money Murder ("S.M.M.") gang to shoot Davon Lewis, another Yung Fame member. He also explained that the two cars he instructed Tabb to follow were looking for members of the S.M.M. gang to exact revenge for the earlier attempted shooting. Eggleston testified that Tedder did not know any of the people at the apartment complex and did not "participate in [the Yung Fame members'] talking about . . . what was going on." Eggleston admitted to having a .40-caliber handgun, which he fired while he was standing through the sunroof, and he confirmed that Glass had a gun, although he did not recall the type of gun. Eggleston was the only witness who testified that Tedder was armed,[5] but he also testified that he could not see whether Tedder shot his weapon because the laundry basket obstructed his view. When Eggleston sat back down in the vehicle, he saw that Glass had suffered a gunshot wound to the head, and he directed Tabb to a hospital.

---

[5] While Eggleston claimed that he could recall specifically that Tedder was riding in the vehicle with a gun on his leg, Eggleston was unable to recall whether the gun was a rifle, a shotgun, or a handgun.

Cedrick Gifford, who was present at the crime scene during the shooting, testified that he had gone to a recreation center on Godby Road to play basketball, but arrived to find the center closed due to an altercation there earlier that day. As he was walking along Godby Road, he saw a car drive past him, and he saw someone shooting from the car; Gifford sustained a gunshot wound to his arm. Gifford was not able to determine at whom the shots were aimed. During the police investigation of the shooting, Gifford picked Eggleston out of a photographic lineup as being in the car; Gifford testified that he knew Eggleston from high school but that he did not know Tedder, Tabb, or Glass. Other than Eggleston, Gifford was not able to see clearly or identify the other people in the vehicle, and he did not identify any individual as having been a shooter. Gifford testified that he was unarmed.

In addition to Tabb, Eggleston, and Gifford, the State offered as witnesses several crime scene technicians, the investigating officers, a firearms and ballistics expert, and the medical examiner. Detective Helio Garcia, who works in the criminal investigation division of the College Park Police Department, assisted in the processing of Tabb's vehicle. He testified that he collected a .40-caliber shell casing from beneath the front passenger seat, a .22-caliber shell casing from behind the front passenger seat, and a second .22-

caliber shell casing from the trunk area behind the rear passenger seats. Jason Roach, a firearms examiner who was qualified as a ballistics expert, opined on behalf of the State that the .22-caliber casings recovered from the car were fired from the same weapon; however, he could not offer an opinion regarding where the shots originated because he did not have any weapons to compare to the shell casings recovered. The State posed numerous hypothetical questions to Roach regarding possible origins of the shot. Roach ultimately agreed that, if the shooter held the gun "gang-style" with a limp wrist while sitting inside the car and holding the gun out the car window, "it's a possibility" that the shell casing could come back toward the shooter into the car.

Dr. Michael Heninger, the forensic pathologist from the Fulton County Medical Examiner's Office, concluded that Glass's cause of death was a gunshot wound to the back of his head. Though Dr. Heninger was unable to locate a bullet during the autopsy, he testified that the entry wound was circular and "smaller than average" when compared to the typical wound inflicted by a handgun and that the angle of the shot was "straight-on." On cross-examination, Dr. Heninger admitted that, due to the mobility of the head, "the shooter could be . . . in a large area behind [Glass]." Tedder's trial counsel also asked Dr. Heninger whether a person in Eggleston's position, standing

through the vehicle's sunroof, could have fired the fatal shot while sitting back down in the car. Dr. Heninger confirmed that such a scenario could produce a bullet trajectory consistent with his findings.

The State also presented the testimony of the College Park Police Department officer who responded to the dispatch call from the hospital to which Glass was taken after the shooting. The officer spoke briefly with Tedder, who was standing by the vehicle outside the hospital, before going into the hospital to speak with Eggleston and Tabb. When the officer returned to the vehicle, he found that Tedder "just took off." On cross-examination, the officer admitted that he never gave Tedder any instruction to remain by the vehicle and wait for him, explaining, "I didn't say if he could leave or not; I just went inside to speak to the other occupants of the vehicle."

Finally, the State offered as a witness Omar Stuart, an ex-boyfriend of Tedder's sister. Stuart claimed that he made contact with Tedder after learning of the shooting, and Tedder asked Stuart for a ride. Stuart, accompanied by his father, picked up Tedder and took Tedder back to Stuart's home. Stuart testified that, upon arriving at his home, Tedder gave him two pistols. Stuart told Tedder that he did not want the pistols and did not ask Tedder for any details regarding the guns, but proceeded to put the pistols in a shoebox and to

hide them in his closet. Stuart testified that, a few days later, Tedder returned to Stuart's home and took the guns. On cross-examination, Stuart testified that he was visiting Tedder's sister at her apartment when the police came by to speak to Tedder; at that time, Stuart told police that weapons were located in the home. Stuart claimed that he found the weapons while searching Tedder's room "to make sure nothing was in the house that could incriminate [Stuart and Tedder's sister]." The police recovered a nine-millimeter pistol from under Tedder's mattress, which did not match the shell casings recovered from Tabb's vehicle. Tedder put up no evidence in his defense.

Based on the totality of the evidence presented at trial, the State argued that Tedder, sitting behind Glass, was the only person who could have fired the shot that killed Glass. Defense counsel argued that Tedder was merely present in the vehicle, that he did not participate in planning or executing the shoot-out, and that he was not armed. Tedder's counsel also attacked Eggleston's credibility, calling him a "liar" and pointing out the inconsistencies in Eggleston's testimony about Tedder's having a gun. Tedder's counsel further argued, consistent with Dr. Heninger's testimony on cross-examination, that Eggleston fired the fatal shot. Ultimately, however, the jury found Tedder guilty on all charges.

Thereafter, Tedder moved for a new trial. In support of his motion, Tedder argued, in relevant part, that he was denied the effective assistance of counsel due to his trial counsel's failure to secure and present the testimony of a crime scene expert. At the hearing on his motion, Tedder presented the testimony of a crime scene expert[6] who unequivocally stated that he "[did] not see any way that [Tedder], being in the backseat of that car, could have caused this gunshot wound to [Glass]." The expert based this conclusion on the lack of soot and stippling found around the wound, the presence of secondary fractures to Glass's skull, and the pattern of the blood spatter found on the passenger side door, all of which he testified indicated that the bullet came from outside the vehicle.

In setting aside the jury's verdict, the trial court concluded only that Tedder was denied the effective assistance of counsel based on his trial counsel's failure to present the testimony of a crime scene expert. As to prejudice, the trial court determined that, had defense counsel provided the jury

---

[6] The expert testified that he is certified in the areas of blood spatter analysis, gunshot residue analysis, crime scene reconstruction, gunshot wounds, and firearms and ballistics.

with this expert testimony, the State's "entire" theory of the case would have been rebutted as virtually impossible, thereby likely changing the outcome.

The State asserts that the trial court erred in finding that Tedder received ineffective assistance of counsel and granting Tedder a new trial. In the State's view, whether Tedder, one of his co-defendants, or someone outside the car fired the fatal shot is inconsequential because, even if he did not shoot Glass, Tedder was liable as a party to the crime, see OCGA § 16-2-20, and, therefore, failed to establish the prejudice prong of Strickland.[7] Reviewing the record as a whole, we conclude that the trial court erred, though not precisely for the reason asserted by the State.

A party claiming a violation of his Sixth Amendment right to effective assistance of counsel bears a heavy burden. He must show both that his counsel's performance was deficient and that the deficient performance so prejudiced his defense that a reasonable probability exists that "but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland v. Washington, 466 U. S. 668, 694 (II)

---

[7] Strickland v. Washington, 466 U. S. 668 (104 SCt 2052, 80 LE2d 674) (1984).

(B) (104 SCt 2052, 80 LE2d 674) (1984).  In reviewing the trial court's order on an ineffective assistance of counsel claim, "we accept the trial court's factual findings unless clearly erroneous, but we independently apply the legal principles to the facts." (Citation and punctuation omitted.) Hulett v. State, 296 Ga. 49, 60 (766 SE2d 1) (2014).  And finally, "[i]f an appellant fails to meet either prong of the Strickland test, it is not incumbent upon this Court to examine the other prong." (Citation and punctuation omitted.) Sloans v. State, 304 Ga. 363, 366 (2) (818 SE2d 596) (2018).

The trial court determined that trial counsel's performance was deficient because of counsel's failure "to obtain and present critical expert testimony that would have rebutted the State's entire theory of the case and evidence that [Tedder] was the only person that could have shot [Glass]."  At trial, however, the State consistently pursued *two* theories of criminal liability — one contending that Tedder was directly liable as the shooter and one implicating Tedder as a party to the crime.  In preparing to defend against these theories at trial, defense counsel explained at the motion for new trial hearing, he spoke with Eggleston and Tabb as well as the few additional lay witnesses who were willing to speak with him about the shooting.  Despite knowing the State's liability theories and that the State intended to call at least two expert

witnesses in its case-in-chief, counsel testified that he "did not think about" hiring a crime scene expert or presenting the same as a witness at trial. It is on this testimony, specifically, that the trial court hinged its finding of deficient performance:

> During the motion for new trial hearing, defense counsel agreed that he knew about the State's theory of the case, evidence, and expert and yet, he never bothered [to procure] or even thought of procuring an independent defense expert to rebut the State's case against his own client. . . . [D]efense counsel provided no reasonable explanation for failing to present expert testimony and even worse, it never entered his mind to even consider procuring and presenting expert testimony. Based on all of the circumstances and facts available to defense counsel and his testimony at [the motion for new trial hearing], his failure to present expert testimony was not reasonable, tactical, or strategic[.]

After reviewing the record, we have reached a different conclusion.

When considering whether trial counsel performed deficiently, "although the thinking of the lawyer may be relevant to our inquiry, we must remember that our inquiry properly is focused on what the lawyer did or did not do, not what he thought or did not think." (Citation and punctuation omitted.) Powell v. State, 291 Ga. 743, 748 (2) (b), n.2 (733 SE2d 294) (2012). In other words, "it is the *conduct* of the lawyer, not his *thinking*, that we assess for reasonableness, even though the thinking of the lawyer may inform the reasonableness of his conduct." (Emphasis in original.) Id. Even if the failure

of Tedder's trial counsel to call a crime scene expert was the result of inattention, counsel's decision to pursue the theory that Eggleston was the shooter was not so unreasonable that no competent attorney would have pursued that strategy. Trial counsel could reasonably have made that decision even if he had known at the time of trial that expert testimony was available pointing to the fatal shot coming from outside Tabb's vehicle.[8] Here, the record reflects that Tedder's trial counsel pursued a theory of defense that Tedder did not have a weapon and, concomitantly, that Eggleston fired the fatal shot. Tedder contends that his trial counsel should have presented the testimony of a crime scene expert who would testify that the fatal shot could not have originated inside the vehicle. At its core, this argument challenges the reasonableness of his trial counsel's theory of defense. Given the paucity of physical evidence and testimony concerning an extra-vehicular shooter, Eggleston's admission that he fired his weapon, the weakness of the ballistics expert's testimony, and the medical examiner's testimony that Glass's wound

---

[8] "[A] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." (Citation and punctuation omitted.) Stripling v. State, 304 Ga. 131, 138 (3) (b) (816 SE2d 663) (2018).

was consistent with the bullet originating from Eggleston's weapon, we cannot say that this trial strategy was objectively unreasonable.

The fact that Tedder's trial counsel "failed to articulate any strategic reasons for his failure to [present expert testimony] makes no difference" because our inquiry is focused on "the objective reasonableness of counsel's performance, not counsel's subjective state of mind." (Punctuation omitted.) Jones v. State, 292 Ga. 593, 601 (7) (d) n.7 (740 SE2d 147) (2013) (quoting Harrington v. Richter, 562 U. S. 86, 110 (IV) (A) (1) (131 SCt 770, 178 LE2d 624) (2011)). Here, it is sufficient that trial counsel pursued a viable and reasonable defense theory that was supported by the evidence. Indeed, the theory that trial counsel pursued could have led the jury to believe Eggleston's testimony about Tedder's not being associated with Yung Fame and its plans to retaliate for the shooting of one of its members — testimony important to Tedder's not being convicted as a party to the crimes, whatever the source of the gunfire — while also believing that Eggleston would lie about Tedder's being armed so Tedder would be blamed for shooting Glass, rather than Eggleston's admitting that he inadvertently shot his fellow gang member while clambering up through and down from the sunroof of Tabb's vehicle. The fact that the chosen strategy failed while another reasonable strategy remained

unemployed does not render trial counsel deficient. "The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." Yarborough v. Gentry, 540 U. S. 1, 8 (124 SCt 1, 157 LE2d 1) (2003). As such, Tedder has failed to demonstrate, in accordance with Strickland, that his trial counsel performed deficiently in failing to present the testimony of a crime scene expert, and we reverse. The case is remanded for the trial court to consider Tedder's other claims.

Judgment reversed and case remanded. All the Justices concur.

Decided March 11, 2019 — Reconsideration denied March 27, 2019.

Murder. Fulton Superior Court. Before Judge Goger.

Paul L. Howard, Jr., District Attorney, Lyndsey H. Rudder, Marc A. Mallon, Arthur C. Walton, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, for appellant.

Geerdes & Associates, Holly L. Geerdes, Kevin L. Marshall, for appellee.