320 Ga. 29
FINAL COPY

S24A0588. TEDDER v. THE STATE.

B ETHEL, Justice.

In October 2015, a jury found Dolonte Tedder guilty of malice murder and related crimes in connection with the shooting death of Quleon Glass.[1] This is the second appearance of Tedder's case in this

---

[1] The crimes occurred on September 8, 2014. On December 12, 2014, a Fulton County grand jury indicted Tedder and co-indictees Jacquavious Eggleston and Teandria Tabb for various offenses. Tedder was indicted for participation in criminal street gang activity (Count 1), malice murder (Count 2), felony murder (Counts 3-5), aggravated assault with a deadly weapon upon Glass (Count 6), aggravated assault with a deadly weapon upon Cedrick Gifford (Count 7), and possession of a firearm during the commission of a felony (Count 9). Eggleston was indicted on each count, as well as an additional count of making false statements (Count 8). Tabb was indicted on Counts 2-4, 6-7, and 9. Eggleston and Tabb pleaded guilty and testified against Tedder at trial.

Tedder was tried alone before a jury from October 26 to October 28, 2015, and was found guilty of all counts. The trial court sentenced Tedder to serve life in prison on Count 2; a concurrent term of 15 years on Count 1; a concurrent term of 20 years on Count 7; and a consecutive term of five years on Count 9. The remaining counts merged or were vacated by operation of law. Tedder filed a timely motion for new trial, which he amended through new counsel. The trial court granted in part the amended motion for new trial, finding that trial counsel rendered constitutionally ineffective assistance. We reversed the trial court's ruling in *State v. Tedder*, 305 Ga. 577 (826 SE2d 30) (2019), and remanded the case to the trial court for consideration of the remaining grounds of Tedder's motion for new trial. Tedder thereafter amended his motion for new trial on two occasions. Following a hearing, the trial court denied the motion, as amended, on October 30, 2023. Tedder filed a timely notice of appeal, and

Court. See *State v. Tedder*, 305 Ga. 577 (826 SE2d 30) (2019) ("*Tedder I*"). Following the trial court's denial of his motion for new trial, Tedder appeals, arguing that the evidence at trial was insufficient to sustain his convictions, that the trial court committed reversible error in two respects, and that trial counsel rendered constitutionally ineffective assistance in three respects. For the reasons that follow, we affirm.

1. We set forth the facts of this case in *Tedder I*:

[O]n the afternoon of September 8, 2014, [co-indictee Teandria Tabb] was hanging out with her boyfriend Glass and his friend Tedder. During that time, Glass received a call from [co-indictee] Eggleston, who wanted a ride to a College Park apartment complex. Tabb, Glass, and Tedder then got into Tabb's vehicle and drove to pick up Eggleston. When the four arrived at the College Park apartment complex, Eggleston exited the vehicle to speak to a group congregated around several parked cars. Shortly thereafter, Glass exited the vehicle, as did Tedder, who did not appear to know the people outside the vehicle. Ten minutes later, Eggleston, Glass, and Tedder reentered the car, and Glass instructed Tabb to follow two other cars. Glass was sitting in the front passenger seat, Eggleston was sitting behind Tabb, and Tedder was sitting behind Glass.
　　Tabb testified that she followed the cars to a house

the case was docketed to this Court's April 2024 term and submitted for a decision on the briefs.

near Godby Road, where all three cars parked, and Eggleston again exited the car to speak with people outside the house. When he returned, Eggleston instructed Tabb to continue following the other two cars. The other cars drove erratically, and, when Tabb would lose track of them, Eggleston used his phone to communicate with persons in the other cars to find out where to meet up. No one in the car questioned what was happening or asked to be let out of the car. According to Tabb, she continued driving, directed by Eggleston, for about twenty minutes, during which time she came to the conclusion that the purpose of the drive was to locate a certain group of people.[2] At some point during the drive, Tabb stopped at a light on Godby Road. While at the light, she heard Glass say "you just want to shoot at them."[3] Tabb recalled that no one in the car seemed surprised by, objected to, or questioned Glass's statement.

When the light turned green, Tabb drove the car through the intersection, and, shortly thereafter, Tabb heard gunshots ring from Glass's weapon.[4] When Tabb heard Glass fire his gun, she also saw, in her peripheral vision, Eggleston stand up through her open sunroof. Tabb could not see what Tedder was doing or whether he had a gun due to a large laundry basket obstructing her vision. During the commotion, she also recalled hearing someone yell, "They were shooting back, they were shooting back." Tabb did not see that Glass was wounded

---

[2] Tabb testified that she came to this conclusion because she heard someone in the back of the car make statements such as, "we can't find them," "they're not here no more," "they just not out here," and "let's just go … they ran, they're not out here no more." Tabb believed it was Eggleston who made these statements, and she, once again, testified that no one else in the car questioned these statements or asked to be let out of the car.

[3] Neither Tabb's nor Eggleston's trial testimony indicated whom Glass was referencing with this statement.

[4] Tabb testified that Glass "carried a weapon everywhere."

until after she drove away from the shooting.

Eggleston testified that he and Glass were friends and fellow members of "Yung Fame," which Eggleston characterized as a rap group but which a detective with the College Park Police Department characterized as having been known to be involved in "gang activity." Eggleston stated that Tedder was not a member of Yung Fame, that he did not know Tedder, and that he first met Tedder on the day of Glass's death. Eggleston explained that, while at the College Park apartment complex, he was speaking with other Yung Fame members regarding an attempt earlier in the day by a member of the Sex Money Murder ("S.M.M.") gang to shoot Davon Lewis, another Yung Fame member. He also explained that [the occupants of] the two cars he instructed Tabb to follow were looking for members of the S.M.M. gang to exact revenge for the earlier attempted shooting. Eggleston testified that Tedder did not know any of the people at the apartment complex and did not "participate in [the Yung Fame members'] talking about . . . what was going on." Eggleston admitted to having a .40-caliber handgun, which he fired while he was standing through the sunroof, and he confirmed that Glass had a gun, although he did not recall the type of gun. Eggleston was the only witness who testified that Tedder was armed,[5] but he also testified that he could not see whether Tedder shot his weapon because the laundry basket obstructed his view. When Eggleston sat back down in the vehicle, he saw that Glass had suffered a gunshot wound to the head, and he directed Tabb to a hospital.

Cedrick Gifford, who was present at the crime scene during the shooting, testified that . . . [a]s he was

---

[5] While Eggleston claimed that he could recall specifically that Tedder was riding in the vehicle with a gun on his leg, Eggleston was unable to recall whether the gun was a rifle, a shotgun, or a handgun.

walking along Godby Road, he saw a car drive past him, and he saw someone shooting from the car; Gifford sustained a gunshot wound to his arm.

. . .

Dr. Michael Heninger, the forensic pathologist from the Fulton County Medical Examiner's Office, concluded that Glass's cause of death was a gunshot wound to the back of his head. Though Dr. Heninger was unable to locate a bullet during the autopsy, he testified that the entry wound was circular and "smaller than average" when compared to the typical wound inflicted by a handgun and that the angle of the shot was "straight-on."

. . .

Finally, the State offered as a witness Omar Stuart, an ex-boyfriend of Tedder's sister. Stuart claimed that he made contact with Tedder after learning of the shooting, and Tedder asked Stuart for a ride. Stuart, accompanied by his father, picked up Tedder and took Tedder back to Stuart's home. Stuart testified that, upon arriving at his home, Tedder gave him two pistols. Stuart told Tedder that he did not want the pistols and did not ask Tedder for any details regarding the guns, but proceeded to put the pistols in a shoebox and to hide them in his closet. Stuart testified that, a few days later, Tedder returned to Stuart's home and took the guns. . . .

Based on the totality of the evidence presented at trial, the State argued that Tedder, sitting behind Glass, was the only person who could have fired the shot that killed Glass. Defense counsel argued that Tedder was merely present in the vehicle, that he did not participate in planning or executing the shootout, and that he was not armed. Tedder's counsel also attacked Eggleston's credibility, calling him a "liar" and pointing out the inconsistencies in Eggleston's testimony about Tedder's having a gun. Tedder's counsel further argued, consistent

with Dr. Heninger's testimony on cross-examination, that Eggleston fired the fatal shot. Ultimately, however, the jury found Tedder guilty on all charges.

*Tedder I*, 305 Ga. at 577-581 (footnotes in original).

2. Tedder contends that the trial court erred by denying his motion for a directed verdict, arguing that the evidence was insufficient to prove he was a party to the crimes. Tedder also contends that the evidence was insufficient to support his conviction for violation of the Georgia Gang Act. We are not persuaded.

(a) We turn first to Tedder's claim that the trial court erred by denying his motion for a directed verdict. In support of this claim, Tedder points to testimony that he did not participate in planning the drive-by shooting, arguing that the State failed to prove that he had prior knowledge that the shooting would occur and, thus, failed to prove that he was a party to the crimes. In Tedder's estimation, the evidence showed, at best, that he concealed the weapons after the crimes and, as such, that he was an accessory after the fact, not a party to the crimes. The evidence presented at trial belies this claim.

The standard of review for the denial of a motion for a directed verdict of acquittal is the same as for determining the sufficiency of the evidence to support a conviction. Under this review, we must put aside any questions about conflicting evidence, the credibility of witnesses, or the weight of the evidence, leaving the resolution of such things to the discretion of the trier of fact. When evaluating the sufficiency of the evidence as a matter of constitutional due process, we must determine whether, viewing the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Monroe v. State*, 315 Ga. 767, 768 (1) (884 SE2d 906) (2023) (citations and punctuation omitted).

Tedder was charged individually and as a party to the crimes of malice murder,[6] aggravated assault with a deadly weapon by shooting bystander Gifford,[7] and possession of a firearm during the

---

[6] See OCGA § 16-5-1 (a) ("A person commits the offense of murder when he unlawfully and with malice aforethought, either express or implied, causes the death of another human being.").

[7] See OCGA § 16-5-21 (a) (2) ("A person commits the offense of aggravated assaults when he or she assaults . . . [w]ith a deadly weapon.").

7

commission of a crime.[8] To prove Tedder guilty of these charges,[9] the State was required to show either that Tedder was the direct perpetrator of the crimes — that is, that he personally possessed a firearm and that he fired the shots that injured Gifford and killed Glass — or that "he intentionally aided or abetted in the commission of the crimes or intentionally advised, encouraged, counseled, or procured someone else to commit the crimes." *Milton v. State*, 318 Ga. 737, 742 (2) (900 SE2d 590) (2024) (citation and punctuation omitted). And "[w]hile mere presence at the scene of the crime is not sufficient evidence to convict one of being a party to a crime, criminal intent may be inferred from presence, companionship, and conduct

---

[8] See OCGA § 16-11-106 (b) (1) (prohibiting any person from "hav[ing] on or within arm's reach of his or her person a firearm . . . during the commission of, or the attempt to commit . . . [a]ny crime against or involving the person of another").

[9] Tedder was also charged with and found guilty of three counts of felony murder (Counts 3-5) and an additional count of aggravated assault with a deadly weapon (Count 6). However, because those counts merged for sentencing or were vacated by operation of law, Tedder was not sentenced on those counts. Thus, to the extent Tedder challenges the sufficiency of the evidence underlying those counts, any such argument is moot. See *Eggleston v. State*, 309 Ga. 888, 890-891 (848 SE2d 853) (2020). We address the sufficiency of the evidence to support Tedder's conviction for participation in criminal gang activity in Division 2 (b) below.

8

before, during, and after the offense." *Frazier v. State*, 308 Ga. 450, 453 (2) (a) (841 SE2d 692) (2020) (citation and punctuation omitted). "Whether the evidence supports such an inference is a question for the jury." *Mohamed v. State*, 307 Ga. 89, 90 (1) (834 SE2d 762) (2019). Applying these principles, we conclude that the evidence presented at trial, when viewed in the light most favorable to the jury's verdicts, was constitutionally sufficient to support Tedder's convictions.

As to the convictions for malice murder and aggravated assault, the evidence did not conclusively show, as Tedder argues, that Tedder participated in planning the shooting. But that makes no difference here because there was sufficient evidence from which the jury could find, based on his conduct immediately before, during, and after the crimes, that Tedder shared a common criminal intent with the actual perpetrator. Specifically, Tabb testified that, before the shooting, it became apparent to her from statements made by one of the men — Eggleston, she assumed but was not certain — that the purpose of her driving the three men around was to locate

9

a certain group of people. She further testified that no one in the car, including Tedder, questioned what was happening or asked to be let out of the car, nor did anyone question Glass's instruction that "you just want to shoot at them." She also testified that Glass, a close friend of Tedder's, "carried a gun everywhere." The jury could infer from this evidence that Tedder knew, or at least became aware before the crimes, that a shooting would occur. See *McGruder v. State*, 303 Ga. 588, 590-591 (II) (814 SE2d 293) (2018). In addition, Eggleston testified that, immediately after the shooting, he saw Tedder waving a gun outside the car window, and Glass, who was sitting directly in front of Tedder, was shot in the back of the head. Evidence also showed that Eggleston was armed with a firearm and that he fired his weapon during the shooting. And there was evidence that, after the shooting, Tedder fled the crime scene and that he concealed two firearms at the home of his sister's ex-boyfriend. From this evidence, a rational jury was authorized to find Tedder guilty beyond a reasonable doubt of malice murder and aggravated assault, at least as a party to the crimes. See *Leanos v.*

*State*, 303 Ga. 666, 668-669 (1) (814 SE2d 332) (2018) (evidence sufficient to support appellant's convictions as party to the crimes despite testimony that appellant did not participate in planning crimes because evidence showed, among other things, that appellant "became aware of the plan" before the shooting, agreed to be the get-away driver, and helped to conceal firearm used in the crimes). Compare *Taylor v. State*, 306 Ga. 277, 285 (3) (a) (830 SE2d 90) (2019) (purported accomplice's "conduct before, during, and after the [shooting] did not indicate an intent to aid or abet appellant in any of the crimes charged" where purported accomplice drove victim to crime scene for drug deal during which victim was killed but did not flee scene with assailants and instead reported shooting to police and disclosed that he and victim were present for drug deal).

As to the conviction for possession of a firearm during the commission of a felony, Eggleston testified that Tedder was armed with a gun during the crimes, which is sufficient to sustain the

11

conviction as a matter of federal constitutional due process.[10] See *State v. Thomas*, 311 Ga. 407, 420 (4) (858 SE2d 52) (2021) (concluding that accomplice's "testimony alone was sufficient to support [appellant's] convictions as a matter of due process under the federal Constitution"). Accordingly, the trial court did not err by denying Tedder's motion for a directed verdict.

(b) Tedder also argues that the State failed to present sufficient evidence to support his conviction for participation in criminal gang activity. More specifically, Tedder contends that the State failed to prove either that Yung Fame was a "criminal street gang," as that term is defined in the Georgia Gang Act, OCGA § 16-15-1 et seq., or that Tedder was associated with Yung Fame. We conclude that the evidence presented at trial was sufficient to establish that Yung Fame was a gang for purposes of the Gang Act and that Tedder was associated with the gang.

Tedder was convicted of violating the Gang Act by

---

[10] Tedder does not challenge the sufficiency of the evidence as a matter of Georgia statutory law.

participating in criminal gang activity through the commission of murder, felony murder, and aggravated assault with a deadly weapon as an associate of Yung Fame. See OCGA §§ 16-15-4 (a) ("It shall be unlawful for any person employed by or associated with a criminal street gang to conduct or participate in criminal gang activity through the commission of any offense enumerated in paragraph (1) of Code Section 16-15-3."); 16-15-3 (1) (J) (enumerated offenses include "[a]ny criminal offense . . . that involves violence, possession of a weapon, or use of a weapon"). And to convict Tedder of violating the Gang Act, the State was required to prove beyond a reasonable doubt (1) that Yung Fame was a "criminal street gang" within the meaning of the Gang Act; (2) that Tedder was associated with Yung Fame; (3) that Tedder committed at least one of the predicate acts of malice murder, felony murder, or aggravated assault with a deadly weapon; and (4) that the commission of those offenses was intended to further the interests of Yung Fame. See *Monroe*, 315 Ga. at 768 (1); *Overstreet v. State*, 312 Ga. 565, 572-573 (1) (b) (864 SE2d 14) (2021). Tedder's arguments on appeal concern

13

the first and second elements, namely, whether the State proved that Yung Fame was a "criminal street gang" and whether Tedder was associated with Yung Fame.

OCGA § 16-15-3 (3) defines "criminal street gang" as "any organization, association, or group of three or more persons associated in fact, whether formal or informal, which engages in criminal gang activity." Tedder argues that the State failed to prove that Yung Fame engaged in "criminal gang activity" because, he says, the State did not present any evidence about the group's involvement in such activity beyond the crimes of which he was found guilty in this case. It is true that "the commission of an enumerated offense by the defendant is not itself sufficient to prove the existence of a 'criminal street gang' because 'an isolated offense by a single member does not fulfil' the statutory requirement of a 'group of three or more persons which engages in criminal gang activity.'" *Boyd v. State*, 306 Ga. 204, 209 (1) (b) (830 SE2d 160) (2019) (quoting *Rodriguez v. State*, 284 Ga. 803, 808 (2) (671 SE2d 497) (2009)) (cleaned up). "But we have also clarified that evidence

14

that *multiple* gang members *conspired* to engage in underlying crimes constituting 'criminal gang activity,' as defined in OCGA § 16-15-3 (1) and (2), *can be* proof of a gang's existing, ongoing criminal activity." *Boyd*, 306 Ga. at 209 (1) (b) (citation and punctuation omitted; emphasis in original).

Here, when viewed in the light most favorable to the jury's verdict, the State presented sufficient evidence to establish that Yung Fame was a group of three or more persons that conspired to engage in "criminal gang activity" as defined by OCGA § 16-15-3 (1) and that Tedder was associated with Yung Fame. The evidence showed that members of Yung Fame were in each of the three cars that left the apartment complex before the shooting, with two members — Glass and Eggleston — riding in a single vehicle, which supports the reasonable inference that Yung Fame had more than three members. In addition, Eggleston testified that Glass was a member of Yung Fame, an investigating officer testified that Yung Fame was "known to be involved in gang activity," and Tabb confirmed that Glass was involved in "gang activity." And the

meeting of the Yung Fame members at the apartment complex to plan the retaliatory shooting established that the group conspired to engage in crimes that constitute "criminal gang activity." See *Boyd*, 306 Ga. at 209-210 (1) (b); *McGruder*, 303 Ga. at 592 (II) (before drive-by shooting was carried out, gang members "'engaged in criminal gang activity' when they gathered to plan the attack"); *Hayes v. State*, 298 Ga. 339, 341-342 (a) (781 SE2d 777) (2016) ("[E]vidence of [appellant's and his co-defendants'] conspiracy to commit armed robbery was proof of their existing, ongoing criminal activity."). Though Eggleston testified that Tedder was not a member of Yung Fame, evidence that Tedder participated in the retaliatory drive-by shooting with other Yung Fame members was sufficient to prove that he was at least associated with Yung Fame, which is all the statute requires. See OCGA § 16-15-4 (a) ("It shall be unlawful for any person employed by or *associated with* a criminal street gang to conduct or participate in criminal gang activity . . . ." (emphasis supplied)). Accordingly, Tedder's challenge to the sufficiency of the evidence supporting his conviction for

16

violation of the Georgia Gang Act fails.

3. Tedder next argues that, when responding to a jury question, the trial court improperly commented on the evidence in violation of OCGA § 17-8-57 (a) (1) ("It is error for any judge, during any phase of any criminal case, to express or intimate to the jury the judge's opinion as to whether a fact at issue has or has not been proved or as to the guilt of the accused."). Relatedly, Tedder asserts that the trial court erred by excluding juror affidavits submitted in support of his claim that the trial court violated OCGA § 17-8-57 (a) (1). We address these arguments in turn.

(a) During deliberations, the jury requested to see transcripts that were used to refresh the recollection of two investigating officers who testified at trial. The transcripts were not admitted into evidence, however, and both the prosecutor and Tedder's counsel agreed that the transcripts could not be provided to the jury. The jurors were brought to the courtroom, where the foreperson explained that they wanted to review the transcripts because they disagreed about the substance of the officers' testimony and wanted

17

to understand why shell casings recovered at the crime scene were not admitted into evidence at trial. In response, the trial judge explained:

> [I]f you recall from the start, what I've been telling you is, you've got to make your mind up based upon what you hear and see in the courtroom. You've heard it, and you've seen it. . . . The interviews that you refer to were not introduced into evidence. The witnesses talked about them. You have to use your recollection of what they said about those things. And again, as I told you, don't try to be detectives. Just try to find out. You have the evidence. That's all the evidence that was put up. That's all you are to consider. That, together with applying your common sense and drawing whatever inferences you think are reasonable in light of the evidence you heard. But that's it. That's it.

Tedder contends that this response amounted to an improper comment on the evidence in violation of OCGA § 17-8-57 (a) because, he says, the trial judge effectively instructed the jurors to disregard any concerns they had about a lack of evidence or conflicts in the evidence. Tedder did not object to the response at trial, and, "as he now concedes, his failure to make a timely objection precludes appellate review, unless the alleged violation of OCGA § 17-8-57 (a) constitutes plain error which affects substantive rights of the

18

parties." *Sturkey v. State*, 319 Ga. 156, 158 (2) (902 SE2d 607) (2024) (citation and punctuation omitted). See also OCGA § 17-8-57 (b). To establish plain error, Tedder "must point to a legal error that was not affirmatively waived, was clear and obvious beyond reasonable dispute, affected his substantial rights, and seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Sturkey*, 319 Ga. at 158 (2) (citation and punctuation omitted).

We see no error, let alone plain error, in the trial judge's response to the jury's question because the response neither pertained to a disputed issue of fact, see *Moore v. State*, 315 Ga. 263, 272 (4) (882 SE2d 227) (2022) ("To violate [OCGA § 17-8-57 (a) (1)], the trial court's comments must pertain to a disputed issue of fact." (citation and punctuation omitted)), nor conveyed "the judge's opinion as to whether a fact at issue ha[d] or ha[d] not been proved or as to the guilt of" Tedder, OCGA § 17-8-57 (a) (1). Instead, the trial judge's explanation that the transcripts were not introduced into evidence and, thus, were not available for viewing was the "type of explanation" that amounts to "a permissible clarification of

19

procedure that does not address the credibility of witnesses or any fact at issue in the trial." *Roberts v. State*, 305 Ga. 257, 262-263 (4) (824 SE2d 326) (2019) (trial judge did not violate OCGA § 17-8-57 (a) (1) by instructing jury to "pay special attention" to video footage because, viewed in context, comment was simply "a straightforward explanation that [the jury] would not have additional opportunities to review the video during deliberations"); *Linson v. State*, 287 Ga. 881, 884 (2) (700 SE2d 394) (2010) (no violation of OCGA § 17-8-57 where trial judge informed jury that video had been redacted to include only relevant portions). As to the remainder of the response, the trial judge did not, as Tedder argues, instruct the jury to disregard a lack of evidence or conflicts in the evidence presented at trial. Rather, the trial judge merely reiterated a point on which the jury had already been charged — that the jury was duty-bound to decide the case based solely on the evidence presented at trial and any reasonable inferences drawn therefrom — which was a correct statement of law. There was no error here, plain or otherwise, and this claim fails.

(b) In a related enumeration, Tedder asserts that the trial court erred by excluding under OCGA § 24-6-606 (b) ("Rule 606 (b)")[11] affidavits executed by two jurors that Tedder submitted at the motion for new trial hearing in support of his claim that the trial court's response to the jury's question violated OCGA § 17-8-57. Tedder argues that the trial court's response to the jury constituted "extraneous prejudicial information" and that these affidavits were admissible to demonstrate "the effect" the response "had on the verdicts entered" in this case or, in other words, to show that he was harmed by the purportedly improper response. But because we have already concluded that there was no error in the trial court's

---

[11] Rule 606 (b) states:

Upon an inquiry into the validity of a verdict or indictment, a juror shall not testify by affidavit or otherwise nor shall a juror's statements be received in evidence as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon the jury deliberations or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith; provided, however, that a juror may testify on the question of whether extraneous prejudicial information was improperly brought to the juror's attention, whether any outside influence was improperly brought to bear upon any juror, or whether there was a mistake in entering the verdict onto the verdict form.

21

response to the jury's question, any error in excluding evidence of harm arising from that response is itself harmless. See *Palmer v. State*, 310 Ga. 668, 677 (3) (853 SE2d 650) (2021) ("It is fundamental that harm as well as error must be shown for reversal." (citation and punctuation omitted)). And in any event, the jurors' affidavits were not admissible under Rule 606 (b) to show the "effect" of anything upon the jury's deliberations.

As we have explained, Rule 606 (b) "creat[es] a nearly categorical bar on juror testimony, with only three specific exceptions." *Harris v. State*, 314 Ga. 51, 55 (2) (875 SE2d 649) (2022) (Rule 606 (b)'s exceptions permit jurors to testify about whether "(A) extraneous prejudicial information was improperly brought to the jury's attention; (B) an outside influence was improperly brought to bear on any juror; or (C) a mistake was made in entering the verdict on the verdict form" (citation and punctuation omitted)). Here, while "Rule 606 (b) permitted the jurors to testify on the question of *whether* extraneous prejudicial information was improperly brought to their attention," the Rule "prohibited them from testifying as to

22

*how* such information affected their deliberations or the verdict," the precise purpose for which Tedder sought to admit the affidavits. Id. (punctuation omitted; emphasis supplied). Accordingly, the trial court did not err by excluding the affidavits under Rule 606 (b).

4. Finally, Tedder asserts that his trial counsel rendered constitutionally ineffective assistance in three respects. To succeed on this claim, Tedder bears the burden of showing "that his counsel's performance both was deficient (objectively unreasonable under the circumstances) and caused him prejudice (shown by establishing a reasonable probability that the result of the trial would have been different absent counsel's deficient performance)." *Harmon v. State*, 319 Ga. 259, 265 (3) (903 SE2d 28) (2024). See also *Strickland v. Washington*, 466 U. S. 668, 687 (III) (A) (104 SCt 2052, 80 LE2d 674) (1984). Critically, a defendant must show both "deficient performance and prejudice through competent evidence, for a silent or ambiguous record is not sufficient to overcome the strong presumption of reasonable performance." *Thorpe v. State*, 304 Ga. 266, 268 (2) (a) (818 SE2d 547) (2018) (citation and punctuation

23

omitted).

(a) Tedder's first claim of ineffective assistance concerns trial counsel's failure to present the testimony at trial of Devon Lewis, the target of the attempted shooting that preceded the retaliatory drive-by shooting during which Glass was killed. Tedder did not present Lewis's testimony at the hearing on his motion for new trial and instead relied on a transcript of Lewis's unsworn statement to police. The trial court rejected this claim, concluding that Lewis's unsworn statement to police was insufficient to establish prejudice. On appeal, Tedder primarily argues that the trial court erred by refusing to consider Lewis's unsworn statement to police in resolving this claim because, he insists, unsworn statements are "legally acceptable substitutes" for witness testimony. As our precedent plainly demonstrates, Tedder is incorrect.

When a defendant asserts that trial counsel was deficient for failing to present the testimony of a witness at trial, he "may not rely on hearsay and speculation, including prior unsworn statements, to prove the prejudice prong of his ineffectiveness

24

claim." *Neely v. State*, 302 Ga. 121, 124 (2) (805 SE2d 18) (2017) (citation and punctuation omitted). Rather, he must present "either testimony from the uncalled witness or a legally recognized substitute" for the witness's testimony. *Harris v. State*, 304 Ga. 652, 655 (2) (a) (821 SE2d 346) (2018) (citation and punctuation omitted). And our precedent is clear that "unsworn statements to police are not a legally acceptable substitute for witness testimony needed to prove prejudice." Id. at 656 (2) (b). See also *Palmer*, 310 Ga. at 678-679 (4); *Manriquez v. State*, 285 Ga. 880, 881 (2) (684 SE2d 650) (2009) (noting that "an affidavit" is "a legally recognized substitute" for an uncalled witness's testimony and that "copies of [witness's] unsworn statements to police" are insufficient to carry burden of proving prejudice). As Tedder relies only on a transcript of Lewis's unsworn statement to police, the trial court correctly concluded that Tedder cannot carry his burden of proving prejudice with respect to this claim. Accordingly, this enumeration presents no basis for reversal.

(b) Tedder next asserts that trial counsel was deficient for

failing to introduce into evidence surveillance video footage from the hospital to which Glass was taken after the shooting. According to Tedder, this footage was crucial to his defense because it showed that Eggleston, not Tedder, disposed of the guns and would have raised reasonable doubt about Tedder's participation in the crimes. The footage was offered as an exhibit to Tedder's amended motion for new trial and is part of the appellate record. Nevertheless, our review of this claim is frustrated by Tedder's failure to direct this Court to the pertinent portion of the video footage.

As this Court has emphasized time and again, we are "not required to scour the record for support for an appellant's arguments." *Davis v. State*, 306 Ga. 140, 144 (3) (829 SE2d 321) (2019). Rather, the burden is on Tedder, the party alleging error, to show it by the record. See *Lee v. State*, 318 Ga. 412, 426 (6) (d) (ii) (897 SE2d 856) (2024). Though at least a portion of the video footage is part of the appellate record, Tedder cites only generally to the footage, which has a running time of more than an hour, and fails to direct the Court to the specific portion that purportedly supports

26

this claim. And despite reviewing the video footage in its entirety, we are unable to identify the relevant portion of the footage, which, from our review, does not appear to depict the events that Tedder says it does.[12] In light of these circumstances, Tedder has not established how introducing the surveillance video footage into evidence at trial could have helped his defense and therefore has not established that counsel's performance was deficient in this regard. See id.; *Shaw v. State*, 292 Ga. 871, 874 (3) (a) n.5 (742 SE2d 707) (2013) ("An ambiguous or silent record is not sufficient to disprove the strong and continuing presumption of competent performance. Therefore, where the record is incomplete or unclear about counsel's actions, we will presume that he did what he should have done." (citation and punctuation omitted)).

---

[12] We note that some portion of the video footage appears to be missing from the record before us. The video footage comprises two electronic files; the footage shown on the first file concludes at approximately 7:00 p.m. on the day of the crimes, and the footage on the second file resumes at approximately 8:00 p.m. As a general matter, the appellant bears the burden of ensuring that the appellate record is complete. See *Ware v. State*, 279 Ga. 17, 18 (2) (608 SE2d 643) (2005) ("When a portion of the evidence bearing upon the issues raised by the enumerations of error is not brought up in the appellate record so that this court can make its determination from a consideration of it all, an affirmance as to that issue must result." (citation and punctuation omitted)).

(c) In his final claim of ineffective assistance, Tedder contends that trial counsel performed deficiently by failing to sufficiently cross-examine Eggleston regarding his initial untruthful statements to police, why he altered his account of the crimes, and his subsequent plea agreement with the State. More specifically, Tedder complains that his trial counsel did not elicit testimony from Eggleston that investigating officers pressured him to change his account of the crimes.

At the motion for new trial hearing, trial counsel detailed his strategic approach for Eggleston's cross-examination. Trial counsel pursued a two-pronged defense in an effort to rebut the State's theories that Tedder either was the direct perpetrator of the crimes or was a party to the crimes. To that end, counsel sought to demonstrate that Tedder both was unarmed and was merely present during the crimes. As to his strategy for cross-examining Eggleston, trial counsel explained that he did not want to question Eggleston too extensively about his changing statements because he did not know what the exact substance of Eggleston's responses might be

28

and he was concerned about eliciting testimony unfavorable to Tedder. Trial counsel instead decided "to focus on the fact that [Eggleston] had a gun," that "[h]e admitted to firing it, and that he admitted to firing it outside of the vehicle," essentially seeking to paint Eggleston as the person directly responsible for Glass's death. And on cross-examination, Eggleston testified that Tedder was not a member of Yung Fame and did not know any of the Yung Fame members prior to the crimes, that Eggleston made conflicting statements about who disposed of the firearms after the shooting, and that Eggleston initially lied to police before changing his story and accepting a plea deal. Trial counsel also elicited testimony that Eggleston was charged with the same crimes as Tedder but that, pursuant to his plea agreement with the State, he was sentenced to serve 20 years in prison while Tedder faced life in prison if convicted.

"Decisions about what particular questions to ask on cross-examination are quintessential trial strategy and will rarely constitute ineffective assistance of counsel. In particular, whether to impeach prosecution witnesses and how to do so are tactical

decisions." *Davis*, 306 Ga. at 146 (3) (e) (citation and punctuation omitted). In light of the cross-examination trial counsel conducted and counsel's testimony at the motion for new trial hearing, Tedder has not shown that trial counsel's strategic approach to cross-examining Eggleston was patently unreasonable. See id.; *Smith v. State*, 303 Ga. 643, 648 (II) (B) (814 SE2d 411) (2018).

Moreover, Tedder has failed to present evidence that Eggleston changed his account of the crimes as a result of pressure from police. In support of this claim, Tedder generally points to a transcript and video-recording of Eggleston's unsworn interview with police during which Eggleston changed his account of the crimes, which Tedder submitted in support of his motion for new trial. But Tedder does not explain — and it is not apparent to us — how this evidence demonstrates that Eggleston's altered statement was coerced by the police, and the mere fact that Eggleston changed his account of the crimes while being questioned by police does not establish that he did so as a result of police coercion. See *Redding v. State*, 307 Ga. 722, 727 (2) (a) (838 SE2d 282) (2020) (appellant failed to

demonstrate that trial counsel performed deficiently by failing to cross-examine witness about possible prison sentence the witness faced in connection with criminal charges brought before the witness testified because appellant failed to present evidence that the witness "had any sort of plea deal with the State . . . in exchange for his statement to police or his testimony at trial"). For these reasons, this claim, like the others, fails.

*Judgment affirmed. All the Justices concur.*

Decided October 15, 2024.

Murder, etc. Fulton Superior Court. Before Judge Richardson.

*Thomas M. West; Geerdes & Associates, Holly Geerdes*, for appellant.

*Fani T. Willis, District Attorney, Kevin C. Armstrong, Elaine L. Thompson, Assistant District Attorneys; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Clint C. Malcolm, Meghan H. Hill, Senior Assistant Attorneys General, Elizabeth Rosenwasser, Assistant Attorney General*, for appellee.